**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Theodore J. ISAACS and Otto Kerner,
Jr., Defendants-Appellants.**

**Nos. 73–1409, 73–1410.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 23 and 24, 1973.

Decided Feb. 19, 1974.

Rehearings Denied March 28, 1974.

1128

---

Sherman C. Magidson, Warren D. Wolfson and Jackson H. Welch, Chicago, Paul R. Connolly, Thomas E. Patton, Washington, D. C., for defendants-appellants.

James R. Thompson, U.S. Atty., Gary L. Starkman, Samuel K. Skinner, William T. Huyck, Glynna W. Freeman and Michael D. Monico, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Before JOHNSEN, LUMBARD and BREITENSTEIN, Senior Circuit Judges.*

PER CURIAM.

Following a six-week trial before a jury in the Northern District of Illinois, Theodore J. Isaacs and Otto Kerner, Jr., were found guilty on February 19, 1973 of a variety of offenses arising out of their activities on behalf of certain Illinois racing interests in return for bribes of more than $150,000 each. Isaacs and Kerner were both convicted on all those counts of an indictment which charged an 18 U.S.C. § 371 conspiracy to violate the Travel Act, 18 U.S.C. § 1952 and the Mail Fraud Act, 18 U.S.C. § 1341 (Count I); use of interstate facilities in furtherance of bribery, 18 U.S.C. § 1952 (Counts II through V) and mail fraud, 18 U.S.C. § 1341 (Counts VI through XIII). Kerner was also convicted of perjury before a grand jury, 18 U.S.C. § 1623 (Count XIV), false statements to Internal Revenue agents,

18 U.S.C. § 1001 (Count XV), tax evasion, 26 U.S.C. § 7201 (Count XVI) and false statement in a tax return, 26 U.S.C. § 7206(1) (Count XVII). Isaacs was also convicted of tax evasion, 26 U.S.C. § 7201 (Count XVIII), and false statement in a tax return, 26 U.S.C. § 7206(1) (Count XIX).

After considering post-trial motions, the district judge on April 19, 1973 dismissed five counts against each defendant, Counts V, VII, X, XI and XII. He sentenced both defendants to three years' imprisonment and fines totalling $50,000 ($10,000 each on Counts I, II, III, and IV, and Count XVI as to Kerner, and Count XVIII as to Isaacs), the prison sentences running concurrently on all remaining counts against each defendant, the fines accumulating consecutively on five counts against each defendant.

We affirm the convictions of Isaacs and Kerner on Counts I, VI, VIII, IX, and XIII, and reverse their convictions on Counts II, III, and IV. We also affirm the conviction of Kerner on Counts XIV, XV, XVI, and XVII and the conviction of Isaacs on Counts XVIII and XIX.

The indictment, returned December 15, 1971, named five defendants:

Isaacs, who had been Illinois Director of Revenue from 1961 to 1963 while Kerner was governor,

Kerner, who was governor of Illinois from 1961 until his resignation in 1968 to become a United States Circuit Judge,

Joseph Knight, Illinois Director of Financial Institutions, 1961 to 1968, while Kerner was governor,

William S. Miller, chairman of the Illinois Racing Board, IRB, by appointment of Kerner, and

Faith McInturf, Miller's secretary.

Joseph Knight was severed because of illness; he died after the trial. When Miller agreed to make full disclosure in August 1972 he and McInturf were

---

* Senior Judge Harvey M. Johnsen of the Eighth Circuit, Senior Judge J. Edward Lumbard of the Second Circuit and Senior Judge Jean S. Breitenstein of the Tenth Circuit, all sitting by designation.

granted immunity and the charges against them were ultimately dismissed. Miller testified; he and Marjorie L. Everett, on behalf of whose racing interests the bribery was allegedly undertaken, were the two principal government witnesses. Mrs. Everett was named as an unindicted coconspirator in the government's bill of particulars.

Our discussion of the numerous claims of error requires a summary of the evidence, from Kerner's campaign for election in 1960 to the disclosures and the investigations in 1969, 1970 and 1971.

For many years prior to 1960 Marjorie Lindheimer Everett had assisted her father, Benjamin Lindheimer, in the operation of his thoroughbred racing interests in the Chicago area. Lindheimer controlled Arlington Park Jockey Club which owned Arlington Park race track, and he also controlled Washington Park Jockey Club which owned Washington Park race track. Another entity in the picture is Balmoral Jockey Club, BJC, a racing company. Mrs. Everett owned some BJC stock at the time of her father's death and desired to continue his racing enterprises. Miller, a friend of Lindheimer and than a member of IRB, which at the time allocated thoroughbred racing dates, agreed to help her. Chicago Thoroughbred Enterprises, CTE, was organized and financed by bank loans of more than $8 million. CTE issued 3,000 shares of stock of which 2,000 went to Mrs. Everett who pledged them at the bank as collateral to secure the CTE loan. Arlington Park Jockey Club and Washington Park Jockey Club became divisions of CTE. The transactions in evidence relate to the acquisition and disposition, by Isaacs and Kerner, of stock in CTE, BJC, and a later formed company, Chicago Harness Racing Company, CHR.

Otto Kerner was the Democratic candidate for governor of Illinois in 1960. Miller assisted in financing his campaign and, through Miller, Mrs. Everett's companies contributed $45,000 in cash to Kerner's campaign. It is not claimed by the government that any impropriety is attached to these contributions. Monies which Miller collected were given to Theodore Isaacs who managed Kerner's campaign. After Kerner's election, he appointed Isaacs as Director of the Department of Revenue and Miller as chairman of IRB. Isaacs invited Miller to suggest new members for appointment to the Racing Board and Mrs. Everett, through Miller, recommended the appointment of Ernest Marsh and Donald McKellar to the Racing Board and James Hayes to the Harness Racing Commission. Kerner made the appointments so recommended. Later, Miller and Mrs. Everett objected to the appointments of A. J. Monaco and David Meyers and those appointments were not made.

In 1961 Miller suggested to Mrs. Everett that she enter the field of harness racing to get more income from greater use of Arlington Park and Washington Park facilities. To accomplish this it was necessary to obtain legislation to permit one corporation to own two race tracks, to allow a racing company to conduct a meet at a track other than its own and to authorize a foreign corporation to own and operate race tracks in Illinois. Senate Bill 717, which approved such corporate actions, was lobbied through the Illinois legislature by Miller and it became law with Kerner's signature.

CTE spent over $5,000,000 to equip Washington Park for harness racing. Washington Park Trotting Association, WPTA, was organized to run the meets and it made a lease with CTE contingent upon the receipt of racing dates from the Harness Racing Commission. Rental was in the form of a percentage of the gross handle. WPTA stock was made available to various Illinois legislators and issued to nominees.

In 1962, Chicago Harness Racing, Inc., CHR, was organized by Mrs. Everett and Miller and had the same landlord-tenant relationship with CTE as did WPTA. The initial CHR stockholders were Chicago businessmen. The common shares were placed for a time in a

voting trust to maintain the control of Mrs. Everett. Miller suggested to her that 50,000 shares of CHR stock be made available for distribution to those who he thought might help the company. These 50,000 shares play a prominent part in subsequent events. Together, WPTA and CHR earned about $6,000,000 for CTE during the period 1962–1968.

According to Mrs. Everett, Miller informed her that Isaacs would act as liaison between Miller and Governor Kerner on racing matters. Miller thought it essential that she have a friend in the Kerner administration in order to ensure the award of racing dates at CTE's tracks and generally favorable consideration from the governor. While their testimony disagreed as to who initiated the subject, Mrs. Everett and Miller discussed the desirability of making racing stock available to Kerner and Isaacs. As a result, on November 8, 1962 Mrs. Everett sent Miller a handwritten note which read:

Dear W S

The following memo is to confirm our telephone conversation of today.

At your earlier suggestion we have been holding:

*For O. K.*

| | |
|---|---|
| 25 shares of C. T. E. common | $25,000 |
| 10,000 shares of W.P.T.A. common | $10,000 |

*For T.I.*

| | |
|---|---|
| 5 shares of C.T.E. common | $5,000 |
| 2,000 shares of W.P.T.A. common | $2,000 |

We did not issue the above as you had suggested that I hold this stock until we received further instructions from you.

For your further information you will recall that the common stock of C.T.E. at the time of merger had a value of $1000 a share.

I shall be pleased to either issue the above stock or hold it—or handle it in any manner you suggest.

Kindest personal regards,
Marj

The next day, November 9, Miller met with Kerner and Isaacs in the governor's Springfield office and told them of Mrs. Everett's stock offer. According to Miller, Kerner said "That's very nice of Marj." When Kerner took the stand he admitted seeing Miller on November 9 but denied that anything had been said about Mrs. Everett's offer of stock. Kerner testified that the only discussion at the meeting related to the racing dates that had been scheduled for the next year. However, the government evidence showed that the final racing dates were not scheduled until a board meeting on November 20. Kerner testified that he first heard of stock being available from Joseph Knight and he agreed to invest in it on Knight's recommendation. However, it is undisputed that nothing was done to set aside the stock or to take it up until four years later in the summer of 1966. At the time of Mrs. Everett's November 1962 offer of CTE stock at $1,000 a share it was worth $2,500 a share.

Isaacs approached Miller on a number of occasions wanting to know when the promised stock would be made available. In December 1963 or January 1964, Miller handed over to Isaacs Mrs. Everett's November 8 note. Although the note had specified the number and types of shares to be received by the defendants, Miller testified at trial that the commitment was considered flexible with the exact number of shares and the particular companies in which an interest would be awarded not definitely settled. Thus, for example, the share of Isaacs was subsequently changed from 5 to 25 shares of CTE, although the reasons for this increase were not explained at trial.

In the spring of 1964 Kerner was confronted with the problem of the allocation of racing dates to Maywood Park Trotting Association, a competitor of Mrs. Everett's enterprises. Miller had corresponded with Kerner, informing him that Maywood had been engaging in fraudulent practices. Thomas Bradley, who was Chairman of the Harness Racing Commission at the time, testified

that Kerner had been deeply involved in the allocation of racing dates to Maywood. According to Bradley, he had been contacted by Kerner who arranged a meeting at which they discussed Maywood's future. Kerner indicated that Maywood had become insolvent and had been taken over by "wrong people." But Bradley took issue with Kerner's characterization of Maywood's financial condition, asserting that, in fact, it was being run by a reputable family and was in the process of substantial renovation. Despite these remarks, Kerner ordered Bradley to "cancel the dates" that the Harness Racing Commission had set aside for Maywood for the fall of 1964 and to reassign them to Sportsman's Park and Washington Park, the latter a division of CTE, controlled by Mrs. Everett. When Bradley adamantly refused to do this, Kerner responded: "Well, now Tom, this is an order."

Bradley testified that, instead of obeying Kerner's order, he chose to hold hearings and audit Maywood's books. The picture which emerged from the hearings and audit was that Maywood was entitled to the fall 1964 racing dates that had been tentatively assigned it. A transcript of the hearings was sent to Kerner, who refused to meet with Bradley and requested his resignation, which was submitted shortly thereafter.

When Kerner took the stand, he disputed Bradley's account of the Maywood incident. He denied ever having had any private meeting with Bradley or ordering the reassignment of racing dates to Sportsman's and Washington Parks. Kerner did admit that he had a meeting in the spring of 1964 with the entire Harness Racing Commission, and that at this meeting the question of Maywood's probable insolvency had been discussed. He testified that his concern over Maywood's insolvency was prompted by reports from several sources concerning its poor financial condition and that he feared that if these reports proved true then Illinois would lose revenue it obtained in the form of a share of the take from Maywood's operations. Kerner re-

quested that the members of the Board determine the accuracy of reports of Maywood's insolvency.

In 1964 Kerner successfully ran for reelection as governor. Mrs. Everett made a $15,000 cash contribution to his campaign which was delivered by Miller to Kerner. Here again no question is raised as to the propriety of the contribution.

In late 1964, a second dispute arose over the allocation of racing dates. Egyptian Trotting Association, one of CTE's Washington Park tenants, had been tentatively allocated the same fall dates for the 1965 season that it had been assigned the previous year. These late fall dates were highly desirable since they included days on which there would be no competition from thoroughbred racing. Clyde Lee, Executive Director of Egyptian, testified that after hearing rumors that Egyptian's dates might, in fact, be awarded to Maywood in 1965, he arranged a meeting with Kerner. At this meeting, he told Kerner that while he did not want to exert pressure on the governor, he would appreciate Egyptian's retaining the late fall dates. According to Lee, Kerner acknowledged that he "was in the middle of the thing and would probably have to make the decision."

Lee testified that he was not satisfied with Kerner's response and flew down to Florida to see Mrs. Everett, who had a direct stake since her company, CTE, leased the Washington Park race track to Egyptian and received a percentage of the handle. After Lee told her about his conversation with the governor, Mrs. Everett immediately contacted James Hayes and told him she wanted Egyptian to retain the late fall dates. But Hayes was in the hospital and meanwhile the only active member of the three-man commission, Walter Murphy, was taking steps to award the dates to Maywood.

Murphy eventually came to see Kerner, complaining that he could not get Hayes to sign the orders awarding the fall

1965 dates. Kerner indicated that, if he tried again, Hayes would in fact approve the orders. Murphy followed Kerner's instructions and Hayes, as had been promised, agreed. Although Egyptian did not get the specific dates it had requested, it was allocated six additional dates, which, of course, meant increased revenues. When Kerner took the stand, he denied any recollection of dealings with Lee or involvement in the allocation of racing dates to Egyptian. He admitted having spoken with Murphy, but testified that he had merely suggested to him that Hayes might change his position if approached again. He denied further personal involvement in the matter.

In 1965 legislation was approved by the Illinois House of Representatives (Bills 1186 and 1187) which was designed to increase state revenues at the expense of race track operators, by increasing the state's receipts from thoroughbred and harness racing. Racing interests, including Mrs. Everett, were strongly opposed to these measures. On May 5, 1965, according to Clyde Lee, he met with Kerner, Paul Powell, the Secretary of State of Illinois, and then State Senator William Lynch, Mrs. Everett's attorney. Kerner was shown schedules prepared by Mrs. Everett's accountants indicating that the legislation might have a disastrous effect on certain harness racing companies. Lee testified that Kerner stated that he would consider the matter "and let [them] know something." Not long after, Kerner met with Miller and Isaacs. Miller suggested alternative legislation involving a less severe impact on the racing companies. Kerner and Isaacs agreed that the original legislation would be detrimental to the state and the racing associations. With Miller's active support and lobbying, revised legislation was enacted which significantly reduced the burden originally contemplated by the Illinois House of Representatives. Kerner signed the bill into law.

On direct examination, Kerner disputed Lee's account of events. Kerner testified that he could not recall having met with Lee, Powell, Miller, and Lynch. Additionally, on cross-examination, he stated that he, in fact, had supported the original legislation, accepting the watered-down version only when it was clear that the harsher original legislation would not pass the Senate. He testified that he had insisted throughout that there be some legislation resulting in an increase in revenues from racing.

In August of 1965 Kerner signed into law a bill which abolished the Harness Racing Commission, which had proved so troublesome under Thomas Bradley's chairmanship. In its place, the Racing Board was given jurisdiction over both thoroughbred and harness racing and expanded to seven members. Among those appointed to the enlarged Board were Miller, as chairman, and Ernest Marsh and Donald McKellar, both originally appointed to the Board by Kerner at the beginning of his first term on the recommendation of Mrs. Everett. Also appointed as members were Crowdus Baker, Roy Tuchbreiter, Charles F. Murphy, Sr., and Kenneth Clark. Apart from Clark, all the others were names suggested to Kerner by Miller after he had had discussions with Mrs. Everett and Isaacs. Indeed, both Tuchbreiter and Baker had earlier been associated with CTE and its affiliates.

An Illinois law enacted in 1965, Ill. Rev.Stat., Ch. 8, § 37a1 (1965), prohibited members of the Racing Board from maintaining any interest in a harness racing company. Thus Miller, as chairman of the Board, found himself in late 1965 in the position of having to dispose of 50,000 shares of CHR which had been allocated to him at the company's formation in 1962. Eventually 28,000 of the shares came into the possession of Isaacs and Kerner. The 50,000 CHR shares had come into Miller's hands through a series of events extending back to 1962 when Joseph Knight informed Miller that he and "his friends" were displeased that they had not been offered interests in race track stock as had many legislators. Miller relayed

this message to Mrs. Everett, who in the summer of 1963 made available 50,000 shares of CHR. The shares were obtained by engineering a CHR stock split over the objections of the board chairman, Modie Spiegel, who protested the dilution of his interest in a letter to Mrs. Everett in which he also complained that he had been "informed that it was imperative to have others receive [CHR] stock in order to get CHR its [racing] dates."

To finance the acquisition of the stock, Miller had had his secretary, Faith McInturf, draft a $20,000 check to Ralph Atlass, who had been chosen by Mrs. Everett to be the nominee for Miller's 50,000 shares. Upon receiving Miller's check, Atlass deposited it, drafted his own check for $20,000 and delivered it to Albert Bell, CHR secretary. Atlass received a voting trust certificate for 50,000 shares, CHR stock at the time being held entirely in a voting trust controlled by Mrs. Everett. On termination of this trust, Atlass received a single 50,000 share certificate which he presented to Miller on May 6, 1965. That same day, Miller called Knight and told him that the shares he had requested were available. Knight, however, was unprepared to pay for them. The two agreed, pursuant to Knight's suggestion, that Miller would open a numbered account at Sincere & Co., a brokerage house. This account, #206, was credited with $4,800 from Knight and 38,000 shares of CHR stock, and 12,000 shares went into account #208, which was Knight's account. Immediately thereafter, CHR issued twelve 1,000 share certificates and one 26,000 share certificate to replace the single 38,000 share certificate.

In January 1966, not long after the new certificates had been delivered by CHR to Sincere & Co., Isaacs informed Miller that "the old man and I are irritated about that delay in receiving Marj's [CTE] stock." Miller promised to contact Mrs. Everett at once. When given Isaacs' message, Mrs. Everett commented that she would do something about it as soon as possible.

At the time, Mrs. Everett had most of her shares of CTE tied up in a single 2,000 share certificate pledged as collateral at the First National Bank on CTE's multimillion dollar loan. She received permission from the bank temporarily to withdraw 50 shares on the condition that she would eventually return them. On February 8, 1966, two 25 share certificates were sent to her attorney, William Lynch. Not long after, toward the end of February, Miller met with Isaacs on a Florida golf course and informed him that the CTE shares were available at Lynch's office. Isaacs expressed satisfaction, but indicated that he wanted to look into the tax consequences.

In March of 1966 Isaacs met with Knight again to arrange for the acquisition of the stocks. Knight told Miller shortly thereafter, however, that neither he nor Issacs had sufficient cash to complete the transactions. Miller suggested that Knight see his secretary, Faith McInturf, to arrange a "loan." Knight contacted McInturf and a $40,000 "loan" was arranged.

On August 10, 1966 Miller, Knight and Isaacs met with George Schaller, an attorney for Mrs. Everett's racing enterprises. Schaller, on behalf of Mrs. Everett, tendered to Isaacs the two 25 share certificates that he, Schaller, had received from William Lynch. In return, Schaller received Isaacs' promissory note and two checks. The note was backdated to November 12, 1962 and promised to pay $50,000 at 5% simple interest. The CTE shares were pledged as security. The two checks given to Schaller were made payable to Mrs. Everett and drawn on Isaacs' personal account in the sums of $50,000 and $8,958. Isaacs presented the $8,958 check as "interest" although according to Mrs. Everett she had never discussed a loan with Isaacs or Kerner. Schaller marked the note paid and gave it to Isaacs and the

CTE certificates were given to Miller. At this time a share of CTE was worth $6,000.

At the request of Miller and Isaacs, Mrs. Everett sent to Isaacs, after the August 10 meeting, a letter, backdated to November 12, 1962, which purported to confirm the purchase of 50 shares of CTE at $1,000 per share. The letter stated that Mrs. Everett would hold the shares as collateral for Isaacs' note to her for $50,000 bearing interest at 5%, and due on or before November 15, 1966.

The funds which Isaacs had given to Schaller for the CTE shares had come in large part from the $40,000 that Faith McInturf had "loaned" to Knight. After depositing McInturf's check Knight had drawn a check for the same amount payable to Isaacs. Isaacs deposited the $40,000 check from Knight to his account as well as a $5,000 check to cash from Kerner. On the deposit slip accompanying this check, Isaacs typed: "Repayment to TJI of advance payment of 25 CTE, balance owing to TJI is $20,000 plus interest at 5% from July 15, 1966."

In addition to the $45,000 from the Knight and Kerner checks, Isaacs contributed $5,000 of his own funds to cover the $50,000 check given to Mrs. Everett for the 50 shares of CTE. The other check given by Isaacs to Schaller was for $8,958 payable to Mrs. Everett, and represented interest on the fictitious loan. No interest was due and the payment thereof ostensibly gave the appearance of legitimacy to the backdated note. One-half of the $8,950 came from Kerner who originally sent it erroneously to Mrs. Everett. She called Miller, who told her to send the check to him for transmittal to Isaacs. Later Kerner sent an IRS form 1099 to Mrs. Everett, reporting the interest payment by him. (The mailing of this form is the basis for Count VI, one of the Mail Fraud counts.)

We turn now to the manner in which $40,000 was generated in order to pay off the McInturf "loan." On July 19, 1966 Kerner issued a $5,600 check to cash. The check eventually reached Isaacs who proceeded to use it to purchase a Civic Center Bank cashier's check #358 for the same amount made payable to Knight. On the reverse side of the receipt for the cashier's check, Isaacs wrote: "O.K.'s ½ of W.P.T. pchse. of 11/12/62 with Chicago Harness substituted for W. P. Trott, by agreement resulting from error in failure to purchase W.P.T. shares according to agreement of Nov. 1962." Isaacs added his own $5,600 check and together these two checks were deposited in Knight's account, as reimbursement for an $11,200 outlay which Knight had deposited more than two weeks earlier in Miller's Sincere & Co. account and which was equal to the price of the 28,000 CHR shares allocated to Isaacs and Kerner.

Later, the two 14,000 share certificates destined for Isaacs and Kerner were transferred from Sincere's name to that of Knight. In early October, Knight wrote George Schaller and requested that he become nominee because of Knight's own poor health. Knight did not mention in his letter who the beneficial owners were, but Schaller agreed to act as nominee upon Mrs. Everett's request that he do so.

In the fall of 1966, CTE and CHR filed applications for 1967 racing dates with IRB. CTE submitted applications on behalf of its two subsidiaries, Arlington Park and Washington Park jockey clubs. On the application Mrs. Everett was listed as the owner of 2,000 CTE shares, although Isaacs and Kerner, in fact, each beneficially owned 25 of these shares. Similarly, CHR's application represented that Schaller owned 38,000 shares, although Isaacs and Kerner were each the beneficial owners of 14,000 of those shares. These statements were made even though the page on which the holdings were listed notified the applicant that

> Dummy Holdings must be indicated, and the real parties owning the equity therein must also be stated.

The racing dates requested were granted to CTE and CHR on the basis of their inaccurate reports.

In February 1967, CHR declared a 20¢ per share dividend, so that Isaacs and Kerner each became entitled to $2,800. Knight wrote Schaller requesting that he "pay such dividend to the true owners thereof, whose identity I have disclosed to you orally." Isaacs, according to Schaller's testimony, shortly thereafter visited him and told him to write two personal checks, one payable to Isaacs and one to Kerner. After informing Mrs. Everett, Schaller deposited the two dividend checks in his account and then drafted two checks each in the amount of $2,800 payable to Isaacs and Kerner. These checks were then deposited by Isaacs and Kerner in their accounts. (The mailing by Kerner of his check for deposit was the basis for Count IX, Mail Fraud.)

Two months later, Miller, who had stepped down from his position as Chairman of IRB, was asked by a long-time friend, Joseph Becker, whether he knew of any race track stock for sale. Miller proceeded to arrange a deal whereby Becker and his brother would purchase the 28,000 shares of CHR held by Schaller as nominee for Isaacs and Kerner. At Joseph Knight's direction and with Isaacs' express approval, Schaller agreed to sell the stock to the Beckers. Joseph Becker was directed by Miller or his secretary, Faith McInturf, to draft two checks for $28,000 payable to Schaller. On May 17, these checks were presented to Faith McInturf. Schaller eventually received them, deposited them in his personal account and then drew two personal checks payable to Joseph Knight and delivered them to Isaacs. Isaacs delivered the checks to Knight who deposited them in his account and then issued three checks, one payable to Isaacs for $7,000, one to Kerner for the same amount, and a $41,642.-48 check to Faith McInturf as repayment for her earlier $40,000 advance, which had enabled the August 1966 acquisition of the 50 CTE shares, plus in-

terest thereon. These checks were deposited by Isaacs, Kerner and McInturf in their respective accounts, with the check to Kerner then sent by his bank to a central depository bank. (This was the basis for the mail fraud charged in Count VIII.) Eventually all three checks deposited cleared through the Federal Reserve Bank in St. Louis, Missouri. (These transactions are the basis for violations of the Travel Act, 18 U.S. C. § 1952, charged in Counts II, III, IV.)

Mrs. Everett still had an obligation to return the 50 CTE shares to the First National Bank where they had originally been held as part of the 2,000 share collateral on the multimillion dollar loan. The First National Bank authorized her to exchange 10,000 BJC shares, also held by the bank as collateral, for the 50 outstanding CTE shares. BJC was a thoroughbred racing company controlled by Mrs. Everett, Miller and CTE, and ran its meets as a tenant of CTE. Miller and Issacs agreed to exchange the CTE shares Isaacs and Kerner beneficially owned for 10,000 BJC shares. On May 12, 1967 the exchange took place. The BJC shares were put in the name of Knight, once again acting as nominee for Isaacs and Kerner.

Miller had gained control of CHR. With funds obtained from the company he was able on June 22, 1967 to acquire a controlling interest in BJC. As chairman of BJC's Executive Committee, he submitted an application for 1968 racing dates to the Racing Board which failed to reveal Isaacs' and Kerner's beneficial ownership of BJC stock. On the basis of this misleading application, the Racing Board granted the dates applied for, sending a race date acceptance form to Miller on November 27, 1967. (This mailing was the basis of the mail fraud charged in Count XIII.)

Miller subsequently took steps to acquire Issacs' and Kerner's BJC shares. Faith McInturf drafted a $300,000 CHR check dated March 26, 1968, payable to Knight, in return for the 10,000 BJC shares beneficially owned by the defendants. Knight endorsed this check in

blank and gave it to Isaacs, who arranged with the Civic Center Bank, whose attorney he was, to negotiate it without an endorsement, although this was contrary to normal bank procedures. Isaacs deposited $135,000 in his checking account and a similar amount in a new checking account opened for Kerner. Then he deposited $15,000 each in two new savings accounts, which he had opened for himself and Kerner.

The end result of all these transactions was that Isaacs and Kerner had each gained $159,800 from sales and dividends and were each out of pocket only $15,079.

The record shows that during the period in question no competitor of Mrs. Everett lost any racing dates. The only gain in dates was that of the additional six days for Egyptian, a tenant of her enterprises. State revenues from horse racing increased from $19.6 million in 1961 to $40 million in 1968. During the same period Mrs. Everett's enterprises flourished. She eventually disposed of her Illinois racing interests, which she valued at $20 million, by taking bonds in Gulf and Western Industries.

In his tax return for the year 1967, Isaacs reported that he had acquired 14,000 shares of "Chicago Co." on July 13, 1966 at a cost of $5,600 and had sold the stock on May 25, 1967 for $28,000; and that he had acquired 25 shares of "Bajo Co." on November 12, 1962 for $25,000 and had sold them on May 12, 1967 for $150,000. In his return for the tax year 1967, Kerner reported that he had acquired 14,000 shares of "Chicago Co." on July 13, 1966 for $5,600 and had sold them on May 25, 1967 for $28,000. Kerner also reported an item identified as "as Exchange C.T. Co. for 5,000 Balmoral" with an acquisition date of November 20, 1962 for $25,000 and a sale date of May 12, 1967 for $150,000. Isaacs and Kerner each treated these items as long-term capital gains. The government asserted, however, that the items referred to were the CHR and CTE stocks which had been acquired in

1966 and had then had a value of $28,000 and $150,000 respectively. According to the government, these had been bribes and were thus taxable as ordinary income in 1966. At the trial the government tax expert testified that treatment of the items as the receipt of bribes, and hence taxable as ordinary income in 1966, would result in a tax deficiency for Kerner of over $83,000 and for Isaacs of over $87,000. (Count XVI charged Kerner with income tax evasion in violation of 26 U.S.C. § 7201. Count XVII charged him with false statements on a return in violation of 26 U.S.C. § 7206(1). Isaacs was similarly charged in Counts XVIII and XIX.)

In her tax return for 1966, Mrs. Everett claimed a long-term capital loss on the sale of the 50 CTE shares. After the IRS had begun an investigation of her return, she disclosed in 1969 her knowledge of the transactions which had occurred and provided her records.

In the ensuing investigation, Kerner, who had resigned as governor in 1968 to take office as a United States Circuit Judge for the Seventh Circuit, was visited in his chambers, on July 15, 1970, by two IRS special agents who told him that he was under criminal investigation for income tax violations, and gave him the Miranda warning. Agent Stufflebeam asked Kerner to identify the "Chicago Co." listed on the 1967 return. Kerner said that it was a financial institution, that he had purchased the stock on the advice of his broker, and that a friend of his, Isidore Brown, was a corporate officer. The facts were that Chicago Co. was privately owned, that Kerner had never owned any of its stock, and that Isidore Brown had never been involved with that company. Kerner also told the agents that the Chicago Co. transaction did not refer to Chicago Harness Racing Company and that his only transactions in racing stock involved the CTE-BJC transactions. (These statements formed the basis for Count XV, which charged the making of false statements in violation of 18 U.S.C. § 1001.)

After the federal grand jury commenced its investigation of Illinois racing operations, Kerner requested to appear. During his lengthy testimony in June 1971 he specifically denied ordering Bradley to withdraw Maywood's 1964 racing dates and denied the conversation with Lee regarding the Egyptian racing dates. (Count XIV, the perjury count, is based on these statements before the grand jury.)

As stated above, Kerner testified in his own behalf, explained at length his version of the various transactions, and specifically denied that he accepted a bribe or did anything to deprive the people of Illinois of their right to honest, good government. Isaacs did not testify. With relation to the income tax counts, the defendants showed that their tax returns were prepared by their accountants on whom they relied. In addition, fifteen character witnesses testified for Kerner.

The principal points presented for review are as follows:

I. The jurisdiction of the district court to try a federal judge upon an indictment prior to removal from office by impeachment.

II. Sufficiency of the evidence of bribery.

III. Validity of the convictions under the Travel Act counts.

IV. Validity of the convictions under the Mail Fraud counts.

V. Validity of the convictions on the conspiracy count.

VI. Validity of Kerner's conviction under the perjury count.

VII. Validity of Kerner's conviction under the false statement count.

VIII. Questions relating to joinder.

IX. Questions relating to severance.

X. Miscellaneous, including questions regarding admission of evidence.

XI. The charge to the jury.

XII. Summations of government counsel.

I. *The jurisdiction of the district court to try a federal judge upon an indictment prior to removal from office by impeachment.*

Kerner became a United States Circuit Judge for the Seventh Judicial Circuit on May 20, 1968, 390 F.2d xv, and still holds that office. The conspiracy count covers a period beginning prior to 1961 and continuing to the date of the return of the indictment with one overt act related to conduct in 1970. The perjury count and the § 1001 count cover matters occurring after he took office as a federal judge. All other counts relate to offenses that precede that event.

The question is whether a court has jurisdiction to try a federal judge upon an indictment before his removal from office by the impeachment process. This point was not raised in the trial court and is presented for the first time on this appeal.

■ ■ Rule 12(b)(2), F.R.Crim.P., provides that defenses and objections based on defects in the institution of the prosecution or in the indictment, other than a failure to show jurisdiction or charge an offense, may be made by motion before trial and, if not made, are thereafter waived. Lack of jurisdiction may be noticed at any time during the pendency of the prosecution. The first problem is whether we are concerned with personal or subject-matter jurisdiction. Personal jurisdiction may be waived by failure to challenge but subject-matter jurisdiction may not. Sewell v. United States, 8 Cir., 406 F.2d 1289, 1292, and Pon v. United States, 1 Cir., 168 F.2d 373, 374; see also Ford v. United States, 273 U.S. 593, 606, 47 S. Ct. 531, 71 L.Ed. 793.

■ Kerner argues that the provisions of Articles I and II of the Constitution relating to impeachment provide the only means of removing a judge from office, and, because conviction on criminal charges is tantamount to re-

moval from office, federal courts are without jurisdiction over the person. The real basis for the argument is the claim of a constitutional privilege or immunity. That claim goes to the power of the court to act, and hence pertains to subject-matter jurisdiction. Cooper v. Reynolds, 10 Wall. 308, 316, 317, 77 U.S. 308, 316–317, 19 L.Ed. 931; Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 305–307, 44 S.Ct. 96, 68 L.Ed. 308; Farmers Elevator Mutual Ins. Co. v. Carl J. Austad & Sons, Inc., 8 Cir., 343 F.2d 7, 11; West Coast Exploration Co. v. McKay, 93 U.S.App.D.C. 307, 213 F.2d 582, 591, cert. denied 347 U.S. 989, 74 S.Ct. 850, 98 L.Ed. 1123; and United States v. New York & O.S.S. Co., 2 Cir., 216 F. 61, 66.

Glidden Company v. Zdanok, 370 U.S. 530, 535–537, 82 S.Ct. 1459, 8 L.Ed.2d 671, was concerned with the authority of judges of special federal courts to sit by designation in federal courts of general jurisdiction. The contention was that the special courts are created under Art. I of the Constitution and hence their judges may not sit on Art. III courts. The point was not presented in the trial court but was raised for the first time on appeal. The government argued that the de facto doctrine precluded consideration of the judges' authority for the first time on appeal. The Supreme Court recognized the "obviously sound policy of preventing litigants from abiding the outcome of a lawsuit and then overturning it if adverse upon a technicality of which they were previously aware." 370 U.S. at 535, 82 S.Ct. at 1465. However, the Court pointed out that when the defect is not merely technical but embodies a strong policy affecting judicial administration, the Court has treated the defect as jurisdictional and considered it though not raised at the earliest opportunity. 370 U.S. at 536, 82 S.Ct. 1465. The Court went on to say that *"A fortiori* is this so when the challenge is based upon nonfrivolous constitutional grounds." Ibid. The Court noted that the existence of diversity of citizenship could be considered

for the first time in the Supreme Court, Mansfield, C. & L. M. R. Co. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462, and City of Gainesville v. Brown-Crummer Investment Co., 277 U.S. 54, 59, 48 S.Ct. 454, 72 L.Ed. 781, and held that the attack on the constitutional authority of the judges should be heard even though not raised in the trial court. 370 U.S. at 537, 82 S.Ct. 1459.

Kerner's challenge is on nonfrivolous constitutional grounds. It relates to the power of the court to act and hence is concerned with subject-matter jurisdiction, which under Rule 12(b)(2), F.R. Crim.P., may be raised at any time. Accordingly, we must consider the jurisdictional issue on its merits.

An examination of the textual references to impeachment in the Constitution reveals the following. The House of Representatives is given the sole power of impeachment. Art. I, § 2. The Senate is given the sole power to try all impeachments. Art. I, § 3. A conviction on impeachment cannot go beyond removal from office and disqualification to hold future offices. Art. I, § 3. Conviction on impeachment does not bar subsequent criminal proceedings against the offender. Art. I, § 3. The President has no power to grant pardons in cases of impeachment. Art. II, § 2. To be removed from office on impeachment, the President, Vice-President, and any civil officer of the United States must be convicted of treason, bribery, or other high crimes and misdemeanors. Art. II, § 4. The impeachment process proceeds without trial by jury. Art. III, § 2. Three other provisions, which do not expressly concern impeachment, must be considered. Members of Congress are privileged from arrest during sessions, except for treason, felony, and breach of the peace, and may not be questioned for any speech or debate in Congress. Art. I, § 6. Federal judges hold their offices during good behavior. Art. III, § 1.

The historical background of the pertinent constitutional provisions has been thoroughly explored and analyzed by many scholars. See e. g. R. Berger, Im-

peachment: The Constitutional Problems; I. Brant, Impeachment, Trials and Errors; B. Shartel, Federal Judges—Appointment, Supervision, and Removal—Some Possibilities Under the Constitution, 28 Mich.L.Rev. 870; Ziskind, Judicial Tenure in the American Constitution: English and American Precedents, 1969 The Supreme Court Review 135; P. Kurland, The Constitution and the Tenure of Federal Judges: Some Notes from History, 36 University of Chicago L.Rev. 665; and Keeffe, Explorations in the Wonderland of Impeachment, 59 Am.Bar Ass'n Journal 885. Any reexamination of this esoteric subject by us would serve no good purpose.

■■■ The Constitution does not forbid the trial of a federal judge for criminal offenses committed either before or after the assumption of judicial office. The provision of Art. I, § 3, cl. 7, that an impeached judge is "subject to Indictment, Trial, Judgment and Punishment, according to Law" does not mean that a judge may not be indicted and tried without impeachment first. The purpose of the phrase may be to assure that after impeachment a trial on criminal charges is not foreclosed by the principle of double jeopardy, or it may be to differentiate the provisions of the Constitution from the English practice of impeachment. R. Berger, supra at 78–80, citing 1 J. Wilson, Works 324 (McCloskey ed.); 14 Annals of Cong. 423 (1805) (giving an interpretation of the clause by L. Martin, a member of the Constitutional Convention.)

■■ The provision of Art. III, § 1, that federal judges "shall hold their Offices during good Behavior", which had a recognized common law meaning and which was accompanied at common law by a procedure for its effectuation, serves as a limitation on the tenure of federal judges. R. Berger, supra at 125–128. No clause in the Constitution is without meaning. Marbury v. Madison, 1 Cranch 137, 174, 5 U.S. 137, 174, 2 L.Ed. 60, and Holmes v. Jennison, 14 Pet. 540, 571, 39 U.S. 540, 571, 10 L.Ed. 579. The inclusion of the tenure provi-

sion does not permit impeachment for conduct less than that which triggers the impeachment provisions of Articles I and II. By the same token it does not exclude prosecution for crime. Protection of tenure is not a license to commit crime or a forgiveness of crimes committed before taking office. Otherwise, a person upon assuming federal judicial office would receive amnesty and would not be accountable for his misdeeds, whenever they occurred. We believe that the framers of the Constitution did not intend such a result.

Our conclusion is supported by contemporaneous construction of the Constitution. The First Congress passed § 21 of the Act of April 30, 1790, now 18 U.S.C. § 201, which provided that a judge convicted of accepting a bribe is thereby disqualified to hold office. Thus the members of the Congress who must have been acutely aware of the provisions of the Constitution and the debate which preceded their adoption construed the Constitution to permit the removal of a judge without impeachment.

In 1796, the House of Representatives referred to the Attorney General serious charges against a territorial judge. The Attorney General ruled that the judge could be prosecuted by information, indictment, or impeachment. See Shartel, supra, at 885, n. 40. The fact that the judge in question was an Art. I, rather than an Art. III, judge does not provide a persuasive distinction. They are both civil officers. The Attorney General advised the House that the judge could be prosecuted by information, indictment, or impeachment and recommended information or indictment as cheaper and easier. The House took no action on the Attorney General's report.

The Jeffersonian Congress in 1802, by repealing the 1801 Judiciary Act and thereby throwing the so-called midnight judges out of office, did so on the constitutional premise that it could remove judges. The fact that after Marbury v. Madison, 1 Cranch. 137, 5 U.S. 137, 2 L. Ed. 60, the judges gave up and never sued to retain their offices proves noth-

ing. The interesting fact is that this early Congress acted as it did.

Turning the pages of history, the Supreme Court said in an 1882 decision, United States v. Lee, 106 U.S. 196, 220, 1 S.Ct. 240, 261, 27 L.Ed. 171, that:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

> It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

In Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057, a United States Senator was convicted, among other things, of having taken a bribe in violation of what is now 18 U.S.C. § 201. He argued that conviction would expel him from the Senate and that under the Constitution the Senate had sole power of expulsion. The Court rejected the contention, quoted with approval from United States v. Lee, and found no violation of the principle of separation of powers.

In Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100, Mr. Justice Douglas said in his dissenting opinion, Ibid. at 140, 90 S.Ct. at 1682: "If they [federal judges] break a law, they can be prosecuted." Mr. Justice Black in his dissent said, Ibid. at 141, 90 S.Ct. at 1683, that " * * * judges, like other people, can be tried, convicted, and punished for crimes * * *."

In United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507, a Senator was charged with a § 201 violation. The trial court held that the Speech or Debate Clause precluded criminal prosecution. The Supreme Court reversed and found no constitutional violation. The Court said, 408 U.S. at 520, 92 S.Ct. at 2541:

> The sweeping claims of appellee would render Members of Congress virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office. Such claims are inconsistent with the reading this Court has given, not only to the Speech or Debate Clause, but also to the other legislative privileges embodied in Art. I, § 6.

Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583, was concerned with the validity of a subpoena requiring the assistant of a Senator to appear as a witness before a federal grand jury. The Senator intervened and asserted a violation of his constitutional privileges. With reference to the Freedom from Arrest Clause, the Court said, 408 U.S. at 615, 92 S.Ct. at 2622:

> It is, therefore, sufficiently plain that the constitutional freedom from arrest does not exempt Members of Congress from the operation of the ordinary criminal laws, even though imprisonment may prevent or interfere with the performance of their duties as Members. * * * Indeed, implicit in the narrow scope of the privilege of freedom from arrest is, as Jefferson noted, the judgment that legislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons.

Finally, we have O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674, decided January 15, 1974. The Court, although its language was general and perhaps dictum, touched on the vulnerability of judges to criminal process, and said, 414 U.S. 488, 503, 94 S.Ct. 669, 680, 38 L.Ed.2d 674:

> * * * we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal depriva-

tions of constitutional rights. Cf. Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1879). On the contrary, the judically fashioned doctrine of offical immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress * * *' Gravel v. United States, 408 U.S. 606, 627, 92 S.Ct. 2614, 2628, 33 L.Ed.2d 583 (1972).

Kerner's argument for the privilege which he claims, is not supported by "the precise words used in any prior case, and surely not on the sense of those cases, fairly read." Brewster, 408 U.S. at 516, 92 S.Ct. at 2539. We conclude that whatever immunities or privileges the Constitution confers for the purpose of assuring the independence of the co-equal branches of government they do not exempt the members of those branches "from the operation of the ordinary criminal laws." Criminal conduct is not part of the necessary functions performed by public officials. Punishment for that conduct will not interfere with the legitimate operations of a branch of government. Historically, the impeachment process has proven to be cumbersome and fraught with political overtones. We believe that the independence of the judiciary is better served when criminal charges against its members are tried in a court rather than in Congress. With a court trial, a judge is assured of the protections given to all those charged with criminal conduct. The issues are heard in a calm and reasoned manner and are subject to the rules of evidence, the presumption of innocence, and other safeguards. 408 U.S. at 519–520, 92 S.Ct. 2531.

Kerner argues that trial and conviction of a federal judge frustrates the separation of powers concept because the executive branch would indict and prosecute. The Constitution makes all "civil officers" subject to impeachment. The issue, then, is whether any civil officer is subject to pre-impeachment indictment. This presents no separation problem. Brewster points out, 408 U.S. at 522, n. 16, 92 S.Ct. 2531, the barriers, such as indictment, burden of proof, and presumption of innocence, which a prosecutor must face. With co-equal branches of government, the potential of abuse by any one of them is inherent. However, the system of checks and balances, a free press, and public resentment toward any attempted domination all work to preserve the guaranteed independence of each branch.

On the basis of the text of the Constitution, its background, its contemporaneous construction, and the pragmatic consequences of its provisions on impeachment, we are convinced that a federal judge is subject to indictment and trial before impeachment and that the district court had jurisdiction to try defendant Kerner.

## II. *Sufficiency of the Evidence of Bribery.*

A basic question is whether the evidence suffices to show that the transactions in question were for the improper purpose of influencing official conduct. The conspiracy count charges an agreement to violate the Travel Act by the use of interstate facilities to distribute the proceeds of bribery, and to violate the Mail Fraud Act by the use of the United States mails in furtherance of a scheme to defraud the State of Illinois and its citizens of their right to have the administration and execution of its laws free from corruption and fraud. The tax counts are bottomed on the theory that the defendants received ordinary income in the form of bribes rather than long-term capital gains resulting from business investments.

The defendants say that the stock acquisitions were legitimate business transactions unrelated to any attempt to influence official conduct and that their conduct was within the realm of propriety. The government contends, and the jury by its verdicts must have found, that the evidence established that Mrs. Everett and Miller offered the stock with a corrupt intent, that Isaacs and Kerner received the stock with knowledge of that intent, and the result was

the improper influencing of official conduct.

The Travel Act, 18 U.S.C. § 1952, makes it unlawful to use any facility in interstate commerce to distribute the proceeds of an unlawful activity. The latter phrase is defined to include bribery in violation of the laws of the state in which committed. The indictment alleges bribery in violation of Ill. Rev.Stat., Ch. 38, § 33–1. Subsection 33–1(d) provides that bribery occurs when property is accepted by a public official with knowledge that it is offered with intent to influence the performance of any act related to his public position. No particular act need be contemplated by the offeror or offeree. There is bribery if the offer is made with intent that the offeree act favorably to the offeror when necessary. See People v. Woodruff, 9 Ill.2d 429, 137 N.E.2d 809; cf. People v. Rizzo, 29 Ill.2d 471, 194 N.E.2d 205, and Commonwealth v. Lapham, 156 Mass. 480, 31 N.E. 638, 639.

Isaacs and Kerner contend that they purchased the stock in 1962 at the stated price; that the stock was pledged as collateral for a loan and could not be delivered immediately; and that they paid the agreed purchase price when the stock was ready for delivery in 1966. Alternatively, they claim that if the November 9, 1962, transaction was not a sale then it was an option to buy, that is, a legal commitment by Mrs. Everett to sell the stock to them at the mentioned price.

Kerner denied the November 9, 1962, conversation with Miller relative to the stock offer. He admitted the meeting with Miller. Indeed, it is shown in Kerner's diary. Kerner testified that the only purpose of the meeting was to learn from Miller the racing dates that had been scheduled for the next year. The evidence was that no final racing dates were scheduled until a board meeting on November 20. If the stock offer was not discussed at the November 9 meeting, then the only basis for the defendants' claim of a 1962 commitment by Mrs. Everett is the 1966 Isaacs note and Everett letter, which were admittedly backdated to 1962, and furnish frail support to the claim of an ordinary business transaction. The effort to camouflage the transaction by the payment of interest on a fictitious note discredits the claim of a legitimate business transaction.

The record sustains a finding that an offer was made. It is not contested that property, the 50 CTE shares, was acquired at a fraction of its true worth. This brings us to the question of the intent of the offeror and the knowledge of the offerees of that intent. Miller testified that he made the stock offer with intent "to cause him [Kerner] to continue to look favorably upon Mrs. Everett and her enterprises." Before the offer Kerner had signed the legislation which made possible the CTE operations. After the offer, he approved legislation supported by Mrs. Everett and others interested in racing. The evidence established that appointments to the regulatory bodies approved by Mrs. Everett and Miller were made by Kerner as governor and that appointments were not made of men of whom Mrs. Everett and Miller disapproved. Kerner's involvement in the allotment of racing dates to Maywood, a competitor of the Everett enterprises, and to Egyptian, a tenant of those enterprises, is established by government witnesses.

In evaluating the contentions of the parties the jury was entitled to consider the facts relating to the CTE, BJC and CHR transactions. These were carried on through the issuance and transfer of corporate stock in the names of nominees, the exchanges of checks which on at least one occasion involved a check to cash, the use of the $300,000 check to establish bank accounts without the endorsement of the depositor, the use of numbered brokerage accounts, the backdating of the note and letter, the fictitious interest payments, and the IRS information return by Kerner showing an interest payment to Mrs. Everett to

which she was not entitled. The defense explanations of these activities are not convincing.

Significant evidence places the stamp of bribery on the transactions. When the CTE stock was offered at $1,000 per share, it was worth $2,500 per share. At the time of the transfer of the CTE stock, and its exchange for the BJC stock, the CTE stock was worth $6,000 per share. The BJC stock was sold for $300,000. Isaacs and Kerner ran none of the risks inherent in ordinary business affairs. Their comparatively miniscule cash outlays served as camouflage to conceal the true nature of the complex activities.

 The Court of Appeals does not retry the case, weigh the evidence, or determine the credibility of witnesses. United States v. Miles, 7 Cir., 401 F.2d 65, 67. The verdict of the jury must be sustained if, taking the view most favorable to the government, substantial evidence and reasonable inferences therefrom support the action of the jury. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; and United States v. Zimmerman, 7 Cir., 326 F.2d 1, 3. We are convinced that the evidence is more than sufficient to establish beyond a reasonable doubt the offer of a bribe, the acceptance of the offer, the corrupt intent of the offerors, the knowledge by the offerees of that intent, the receipt of valuable property by the offerees, and actions by the offerees favorable to the offerors.

III. *Validity of the Convictions under the Travel Act Counts.*

Issacs and Kerner were found guilty, as charged in Counts II, III and IV, of violating 18 U.S.C. § 1952, the Travel Act, which prohibits, inter alia, the use of

any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or * * *

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, * * *.

 The government's proof supporting federal jurisdiction on Counts II, III and IV rested on evidence that three checks, drawn by Joseph Knight on his account at the First National Bank of Alton, Illinois, to distribute some of the proceeds of the bribery scheme to Kerner and Isaacs, had cleared through the Federal Reserve Bank in St. Louis, Missouri, after deposit by the recipients in Illinois banks. Specifically, Count II involved a $7,000 check drawn to and received by Isaacs in payment for the sale of CHR stock. Count III concerned a second $7,000 check drawn to Kerner in payment for his CHR shares. Count IV was based on the clearance of a $41,642.48 check to Faith McInturf as repayment for her loan, which had enabled Isaacs and Kerner to obtain CTE stock.

The government maintains that the passage of these three checks, either by truck or by R.E.A. air express, across the Mississippi River into Missouri from Illinois represents sufficient interstate activity to support Isaacs' and Kerner's convictions for violating § 1952. The defendants, on the other hand, contend that § 1952 requires a more substantial showing of use of interstate facilities as a necessary element of the alleged unlawful activity. For reasons which follow, we conclude that the use of interstate facilities here was so minimal, incidental, and fortuitous, and so peripheral to the activities of Isaacs, Kerner and the other participants in this bribery scheme, that it was error to submit Counts II, III and IV to the jury.

The Supreme Court has spoken of the scope of § 1952 primarily in Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493. In holding that the operators of a Florida gambling establishment could not be prosecuted under § 1952 by reason of the fact that some of their customers travelled there

from Georgia, the Court emphasized that Congress in enacting § 1952 intended primarily to strike at organized crime's interstate operations and that there was no desire to

> alter sensitive federal-state relationships, * * * overextend limited federal police resources, * * * [or] produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies. 401 U.S. at 812, 91 S.Ct. at 1059.

The Court concluded that to hold the defendants liable for the crossing of state lines by their customers would unduly extend the federal power to prosecute essentially state crimes. Similarly, were the § 1952 counts here to be upheld, the federal-state balance would be seriously upset. It would be the rare case where investigation of an enterprise in violation of state law would not disclose some incidental and fortuitous use of interstate facilities which might then be used to support a federal prosecution. Nothing in the legislative history supports such a broad reading of the statute. S. Rep.No.644, 87th Cong., 1st Sess., U.S. Code Cong. & Admin.News 1961, p. 2664. See also Erlenbaugh v. United States, 409 U.S. 239, 247 n. 21, 93 S.Ct. 477, 34 L.Ed.2d 335; United States v. Archer, 2 Cir., 486 F.2d 670.

■ When faced with the task of determining the scope of an ambiguous criminal statute such as § 1952, courts have long adhered to the principle that "ambiguity * * * must be resolved in favor of lenity." United States v. Enmons, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379. See also United States v. Bass, 404 U.S. 336, 349–350, 92 S.Ct. 515, 30 L.Ed.2d 488. Amplifying on this principle, the Court in Bass noted that

> [We] emphasized only last Term in Rewis v. United States, *supra,* we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision. In Rewis, we declined to accept an expansive interpretation of the Travel Act. 404 U.S. at 349, 92 S.Ct. at 523.

Decisions of the Seventh Circuit also lend support to defendants' argument that the interstate activity in this case was inadequate to trigger § 1952. The first of these decisions, United States v. Altobella, 7 Cir., 442 F.2d 310, involved an extortion scheme in which an individual was photographed in a compromising situation and then threatened with disclosure unless he paid the sum demanded by the defendants. The defendants knew that the victim was from Philadelphia and that in order to pay them, he would have to cash an out-of-state check. After being cleared through Chicago banks, this check was forwarded to Philadelphia by mail. The court held, however, that the defendants had not violated § 1952. Speaking for the court, Judge Stevens began by noting that § 1952 was enacted to curb criminal activities, particularly racketeering, extending beyond the borders of one state and against which local law enforcement efforts would be ineffective. More than minimal interstate travel incidental to the alleged criminal activity was contemplated by Congress before federal intervention would be warranted. S.Rep.No. 644, 87th Cong., 1st Sess., U.S.Code Cong. & Admin.News 1961, p. 2664; United States v. Zizzo, 7 Cir., 338 F.2d 577, 580. In light of this, the court held that the convictions of the defendants in Altobella would have to be reversed since

> [t]he use of the mails by the bank through which appellants' victim's check was cleared * * * was purely incidental to appellants' sordid scheme. Their purpose would have been achieved equally well if the victim had borrowed $100 from asso-

ciates at the hotel or written a check on a local bank. 442 F.2d at 315.

These same considerations apply with equal force to the three checks forming the basis for the § 1952 counts here. They, too, were incidental to the scheme; checks which would have cleared through Chicago, rather than through St. Louis could just as easily have been utilized. Indeed, the foundation for finding a violation of § 1952 was even stronger in Altobella. The defendants there at least had reason to believe the check would travel interstate. Here, no one involved in the scheme had reason to suppose that checks drawn on the Alton bank would clear through St. Louis.

 The government, nevertheless, argues that the present case is distinguishable since the interstate activity here was in furtherance of a far more "serious" offense than the extortion scheme in Altobella. But although bribery involving state officials concededly is a more "serious" crime, the legislative history and § 1952 itself draw no distinctions between serious and insubstantial state offenses. Rather, the test for application of § 1952 is the nature and degree of interstate activity in furtherance of the state crime.

 The government also suggests that Altobella may be distinguishable on the ground that the interstate activity in that case was brought about by the actions of the victim and not those of the defendants as in the present case. We disagree. While it is true that the victim in Altobella signed the check that travelled in interstate commerce, he had little choice in the matter; his actions were compelled by the extortionists in furtherance of their scheme. They were as much responsible for the interstate activity in that case as were Isaacs and Kerner here. The determination of whether § 1952 has been violated should hardly depend on who actually signs or receives a check that crosses state lines in the process of collection.

A month after the decision in Altobella the Seventh Circuit again interpreted § 1952 in United States v. McCormick, 7 Cir., 442 F.2d 316, wherein the basis for jurisdiction was an advertisement placed by the defendant in a local Indiana newspaper for salesmen to peddle lottery tickets, even though lotteries violated Indiana law. Some 200 to 500 copies of the ad were mailed to the newspaper's out-of-state subscribers. On the basis of these mailings, the defendant was charged with and convicted of violating § 1952. On review, the conviction was reversed. The court reaffirmed its earlier position in Altobella, that "minimal" and "incidental" use of interstate facilities does not constitute a violation of § 1952.

United States v. Lee, 7 Cir., 448 F.2d 604, cert. denied 404 U.S. 858, 92 S.Ct. 107, 30 L.Ed.2d 100, concerned an appeal from a conviction under § 1952 for running an illegal gambling operation in which two employees regularly crossed state lines from their residences in Kentucky to reach the illegal enterprise in Indiana. The court of appeals upheld the convictions, noting that the record disclosed "continual interstate travel by employees of the illegal venture as well as substantial regular illegal activity 'thereafter' * * *." 448 F.2d at 607. In contrast with Lee, however, here the defendants were responsible for only three checks written in furtherance of the bribery scheme and which happened to be sent across state lines. Like McCormick and Altobella, there was only an "incidental" or "happenstance" use of interstate travel, without which the criminal scheme could just as easily have been accomplished.

Only in the Fourth Circuit do we find any support for the government's position. In United States v. Salsbury, 4 Cir., 430 F.2d 1045, the court held that the cashing of out-of-state checks with a local druggist by the operator of a Maryland gambling operation supported a conviction under § 1952 since these checks were eventually sent across state lines for clearance by the bank in which the druggist deposited them. Although there is some language suggesting a

broad interpretation of § 1952, the facts of the case would support a conviction even under the restrictive reading given § 1952 by the Seventh Circuit decisions. The interstate activity in Salsbury was not incidental or a matter of happenstance. The gambling operation catered to a large number of out-of-state customers who were prepared to pay their gambling debts only by check. To assure continued patronage by these gamblers and thereby the successful conduct of the criminal activity it was crucial that these checks be accepted, even though they would eventually travel out-of-state for clearance. Indeed, the sheer number of checks deposited and destined to be sent beyond Maryland's borders enforces the view that the interstate activity in Salsbury was hardly minimal, incidental, or fortuitous, but rather was central to the criminal scheme.

 An earlier Fourth Circuit decision cited in Salsbury and relied on by the government here, United States v. Wechsler, 4 Cir., 392 F.2d 344, cert. denied 392 U.S. 932, 88 S.Ct. 2283, 20 L. Ed.2d 1389, involved the deposit of a check in furtherance of a bribery scheme. A divided court concluded that "[w]hen one deposits a check, there would seem to be little doubt that he is using a facility in interstate commerce" so that § 1952 comes into play. 392 F.2d at 347 & n. 3. We are unable to agree with this view of § 1952, however, not only because it assumes that the use of a single check crossing state lines may trigger § 1952, but also because it suggests that the check need not actually travel interstate.[1] We cannot agree that the incidental use of a federally regulated banking facility furnishes the jurisdictional element of a § 1952 offense.

 This same erroneous and highly prejudicial view was reflected in the judge's charge to the jury and would by itself require a reversal of Isaacs' and Kerner's convictions on the three § 1952 counts. The judge incorrectly stated that

> The act of depositing a check representing the proceeds of an unlawful activity in a bank, that is, a national bank or a member of the Federal Reserve System or a bank insured by the Federal Deposit Insurance Corporation, FDIC, constitutes use of a facility in interstate commerce.

Accordingly, the convictions on Counts II, III and IV must be reversed.

IV. *Validity of the Convictions under the Mail Fraud Counts.*

Isaacs and Kerner were also convicted of mail fraud under Counts VI, VIII, IX and XIII of the indictment, 18 U.S.C. § 1341. Specifically, they were charged with defrauding the State of Illinois and its citizens of the honest and faithful services of Kerner as governor, failing to administer the laws of the state in an impartial manner, obtaining secret profits as a result of the bribery scheme in which they actively participated, and defrauding the racing associations of Illinois of the right to obtain racing dates free from corruption and bribery. On appeal, they challenge their convictions by arguing that they could not have violated the mail fraud statute because the indictment failed to charge that they had defrauded the State of Illinois, its citizens, or the racing associations "out of something of definable value, money or property." Absent a monetary loss, they maintain, the breach of fiduciary duty which occurred here amounts to no more than a constructive fraud and not a violation of § 1341. We do not agree.

 The mail fraud statute is not restricted in its application to cases in which the victim has suffered actual

---

1. See United States v. DeSapio, S.D.N.Y., 299 F.Supp. 436, 448–449, aff'd, 2 Cir., 435 F.2d 272, cert. denied 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166. That some interstate travel is actually required by the statute is indicated by § 1952's use of the term "facility in interstate or foreign commerce" rather than "facility of interstate or foreign commerce."

monetary or property loss. See, *e. g.*, United States v. Dorfman, S.D.N.Y., 335 F.Supp. 675, 679, aff'd on other grounds, 2 Cir., 470 F.2d 246; United States v. Faser, E.D.La., 303 F.Supp. 380, 384; Bradford v. United States, 5 Cir., 129 F.2d 274, 276, cert. denied 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547.

In a related development, the Supreme Court has made clear that a defendant may be convicted of conspiracy to defraud the United States, 18 U.S.C. § 371, even though the government has not suffered a financial loss. Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569; United States v. Barnow, 239 U.S. 74, 79, 36 S.Ct. 19, 60 L.Ed. 155. See also Miller v. United States, 2 Cir., 24 F.2d 353, 359, cert. denied 276 U.S. 638, 48 S.Ct. 421, 72 L.Ed. 745. In Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968, the Court noted that:

> It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention.

In Shushan v. United States, 5 Cir., 117 F.2d 110, cert. denied 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531, it was recognized that

> No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud. 117 F.2d at 115.

Shushan upheld the mail fraud prosecution of a member of a Louisiana parish levee board for receiving kickbacks from the underwriters of a plan to refund outstanding bonds of the levee district. The defendant argued that no actual fraud had occurred since the refunding operation was actually profitable to the levee board. Nevertheless, the court stressed that

A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public. Id.

■ As has been shown above, this is precisely what occurred here. The citizens of Illinois were defrauded of Kerner's honest and faithful services as governor.

The Seventh Circuit recently dealt with a somewhat similar fact situation in United States v. George, 7 Cir., 477 F.2d 508, cert. denied 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (Oct. 9, 1973). In that case, an employee of Zenith Radio Corporation received kickbacks from a supplier of cabinets to whom he had awarded a Zenith contract. The evidence showed that the cabinet supplier was the only available source of the item at the time, that the price paid by Zenith was fair and reasonable, and that no other preferential treatment was accorded the supplier in return for the kickbacks. In affirming the convictions, the court stated that

> If there was intent * * * to deprive Zenith of [its employee's] honest and loyal services in the form of his giving [the supplier] preferential treatment, it is simply beside the point that [the employee] may not have had to (or had occasion to) exert special influence in favor of [the supplier] or that Zenith was satisfied with [the supplier's] product and prices. 477 F.2d at 512.

There was evidence here not only that the State of Illinois and its citizens were deprived of the loyal and honest services of their governor, Kerner, but that the defendants actually did exert special influence in favor of and bestowed preferential treatment on Mrs. Everett.

■ Having concluded that there was a prosecutable scheme to defraud, with active and intentional participation by Isaacs and Kerner, we must then consider whether the jury could find that

the mailings alleged in the indictment were in furtherance of the scheme, as required by § 1341. We conclude that it could so find.

Count VI was based on an IRS form 1099 interest payment notice mailed by Kerner to Mrs. Everett, on or about February 21, 1967, and a copy of which was sent to the Internal Revenue Service. The government claimed, and the jury could find, that Mrs. Everett had made no loan to Kerner. The "interest" reported on the form was a deceptive method of legitimizing the backdated note presented to Mrs. Everett in 1966 at the time of Kerner's acquisition of CTE stock in order to make the bribe appear as a 1962 sale and purchase. It is enough that the mailing contributed to the carrying out of the scheme. See Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435.

■ Counts VIII and IX charged mailings related to the distribution of proceeds resulting from the bribery scheme. The specific mailing charged in Count VIII was the transmittal, on or about June 1, 1967, of the $7,000 check, drawn by Knight to the order of Kerner and deposited by Kerner in the Antioch Savings and Loan Bank, by that bank to the American National Bank for collection. This $7,000 check from Knight to Kerner represented proceeds from the sale of CHR stock to the Becker brothers in May, 1967. The mailing was in furtherance of the scheme because the success of the venture depended upon receipt of funds laundered by nominees such as Knight, which in turn depended upon the bank collection processes. Distribution of the CHR proceeds through a nominee was one step in the plan to provide Kerner with the cash benefits of the bribery.

■ Count IX charged that, on or about March 6, 1967, Kerner had mailed a $2,800 check, the sum of CHR dividends received by George Schaller as his nominee, to the First National Bank of Chicago for deposit. Schaller had washed the funds initially by depositing the check from CHR in his personal account and then writing his own check to Kerner for the same amount. As with the $7,000 check from Knight, the receipt and deposit of this payment represented an elaborate laundering method by which the conspiracy to defraud could be concealed and was thus an integral part of the mail fraud scheme.

■ The mailing charged in Count XIII was the race date acceptance letter sent by the Illinois Racing Board on or about November 27, 1967 to Balmoral Jockey Club president, Harold Anderson. The racing dates awarded in the acceptance letter had been allocated on the basis of a false application submitted by Balmoral Jockey Club, listing in Knight's name the stock beneficially owned by Kerner, in violation of board regulations and state law. The defendants argue that the mailing was not caused by them and therefore does not support their convictions. The mailing of the acceptance letter by the board would not have occurred had William Miller not first sent the application for racing dates, which he knew was false. He obviously sought response to his application from the board. Since there was evidence that Isaacs and Kerner were participants in the scheme, they "may be convicted of the mailing of a letter which one of [their] partners caused to be mailed in the execution of the scheme." Chambers v. United States, 8 Cir., 237 F. 513, 524; Baker v. United States, 8 Cir., 115 F.2d 533, 540, cert. denied 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128.

We do not find anything in United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603, decided by the Supreme Court on January 8, 1974, which would require reversal on any of these four mail fraud counts. In that case Maze had received the full benefit of each fraudulent use of the stolen credit card before the transmittal of the invoices by mail to the Louisville bank. Thus the Court said that "[r]espondent's scheme reached fruition when he checked out of the motel, and there

is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." —— U.S. ——, ——, 94 S.Ct. 645, 649, 38 L.Ed.2d 603.

Here the success of the scheme to defraud so far as all participants, and particularly Kerner and Isaacs, were concerned, depended on the continued concealment of the bribery scheme, and the devious and complicated devices which were used until they finally received the cash benefits of the bribery in March 1968. It was not until Isaacs and Kerner had each received $150,000 for their BJC stock which they had received in exchange for CTE stock that it can be said that the bribery had come to full fruition, and the payment of $300,000 for the stock by CHR was concealed by a check for that amount to Joseph Knight who held the stock as nominee for Isaacs and Kerner. Knight in turn endorsed the check to Isaacs. Isaacs was able to avoid endorsement by negotiating it through the bank for which he was counsel, and divided the proceeds between Kerner and himself through new accounts which Isaacs then opened. Moreover, it was not until April 1968 that Isaacs and Kerner made any disclosure of their gains in their tax returns for the year 1967, which even then were designed to conceal their true nature.

Thus, the mailings, all made in 1967, which form the basis for the four mail fraud counts of which Isaacs and Kerner were convicted, were each made for the purpose of executing the fraudulent scheme or attempting to do so. The Count VI mailing by Kerner of the 1099 form to Mrs. Everett, on or about February 21, 1967, was integral to the pretense that Mrs. Everett had loaned money to Isaacs and Kerner in 1962.

The Count VIII mailing of the $7,000 Knight check to Kerner by the Antioch Bank, on or about June 1, 1967, was necessary to the acceptance and the concealment of the proceeds of the CHR stock, the smaller part of the bribery.

The Count IX mailing by Kerner, on or about March 6, 1967, of Schaller's $2,800 check to the First National Bank of Chicago, was also necessary to the acceptance and concealment of a dividend from the CHR stock.

The Count XIII mailing by the Racing Board to BJC, on or about November 27, 1967, of the race date acceptance form, was a necessary sequel to the concealment of the beneficial interest Isaacs and Kerner then had in BJC, without which concealment the race dates might not have been given as the application therefor failed to make the disclosures required.

Since there was evidence as to all the elements of a violation of § 1341, including active participation in a scheme to defraud, fraudulent intent, and use of the mails in furtherance of the scheme, see Pereira v. United States, *supra*, we affirm the convictions of Isaacs and Kerner on Counts VI, VIII, IX and XIII.

V. *Validity of the Convictions on the Conspiracy Count.*

Count I charges a § 371 conspiracy to violate the Travel Act and the Mail Fraud Act. We have held that the convictions on the substantive Travel Act counts must be reversed and those on the substantive Mail Fraud counts must be sustained. The problem remains as to the validity of the conviction on the conspiracy count.

■■■■■■ Conspiracy is an independent offense, perhaps more reprehensible than the substantive crime. United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211. Each count in an indictment must be treated as a separate indictment. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356. Acquittal on a substantive count does not bar conviction for conspiracy unless there is an identity of the proof necessary. United States v. Fassoulis, 2 Cir., 445 F.2d 13, 18, cert. denied 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 100; United States v. Carlton, 5 Cir., 475 F.

2d 104; and Mackett v. United States, 7 Cir., 90 F.2d 462, 465.

Defendants assert that the proof does not show an intent to use interstate facilities in violation of the Travel Act or to use the mails in violation of the Mail Fraud Act. On the substantive Mail Fraud counts we have held that the evidence showed the requisite intent to use the mails. On the Travel Act counts we reverse the convictions because of the minimal use of the interstate facilities and because of an erroneous instruction. Under the Travel Act the use of the interstate facilities furnishes only the jurisdictional base and need not be intentional. The pertinent intent required by the statute relates to the distribution of the proceeds of an unlawful activity. The evidence shows that the distribution of the bribery proceeds was part of the complex, over-all plan of the defendants. Intent to provide the jurisdictional base is not essential to proof of conspiracy to commit the crime. See United States v. Roselli, 9 Cir., 432 F.2d 879, 892, cert. denied 401 U.S. 924, 91 S.Ct. 883, 27 L. Ed.2d 828.

The reversal of the substantive Travel Act counts does not require reversal of the conspiracy charge. Cf. United States v. Bates, 7 Cir., 141 F.2d 436, 437, rev'd on other grounds, 323 U. S. 15, 65 S.Ct. 15, 89 L.Ed. 13, modified 148 F.2d 907; and Andrews v. United States, 4 Cir., 108 F.2d 511, 515. The evidence sustains the conviction on the conspiracy count.

## VI. *Validity of Kerner's Conviction under the Perjury Count.*

Kerner attacks his conviction of perjury under 18 U.S.C. § 1623 on contentions of (1) duplicity of the count (Count XIV), (2) possibility that the jury convicted him for a "literally true" answer to a question posed to him before the grand jury, and (3) unconstitutionality of the statute.

The claim of duplicity rests in part upon a preliminary question which was not included in the questions and answers which the indictment alleged were false. That question was:

As Governor did people come to you and discuss with you or ask you for favors with respect to racing dates and then you refer these people to Mr. Miller or the Racing Commissioner?

Kerner answered in the negative and said:

\* \* \* [O]nly once did anyone approach me and send a letter, brochure, concerning racing dates. And it had to do with Maywood and the name "Allen" comes to my mind.

The declarations of Kerner on which the perjury count was predicated are set out in footnote 2.[2] He was questioned

2. Q. Do you recall anyone coming to you with respect to the race dates that had been assigned to or were under consideration for Egyptian Trotting?

A. No, as I say, the only recollection I have of anyone coming to me complaining about dates was Allen of Maywood. I never discussed dates with anybody other than Allen to my best recollection.

Q. Do you know the persons in interest in the racing entity known as the Egyptian Trotting Association?

A. No, I don't.

Q. Did you ever say to anyone with respect to Egyptian Trotting dates, "It is difficult to make a decision when two people want the same racing dates?"

A. I could not have made that statement.

Q. I take it—

A. My only recollection of anyone coming to me about race dates was Maywood. I have no recollection of any conversation about racing dates with anybody else. I didn't inject myself in that area at all; at no time.

Q. Well, when you appointed the members to the Harness Racing Commission, was Thomas Bradley the chairman?

A. I think he was the chairman.

Q. He was the chairman?

A. Yes.

Q. Did he come to you on some occasion when you had a discussion with him regarding racing dates at Maywood?

A. No.

before the grand jury at some length regarding discussions that he allegedly had with James Hayes, Clyde Lee, and Thomas Bradley about racing dates. At the trial both Lee and Bradley testified as to the discussions, but the Hayes incident was withdrawn from jury consideration for lack of evidence, because of Hayes' death.

██ Kerner contends that the preliminary question, supra, was confusing in that it led him to believe that the subsequent questions pertained only to the question of his having influenced the allotment of racing dates and not the matter of conversations about racing dates, and that the indictment having charged false declarations by him as to both of these matters in a single count

was duplicitous. These contentions are without merit.

The grand jury's inquiry was directed at Kerner's involvement in the allocation of racing dates. The questions regarding the conversations by Kerner with Lee and Bradley were subsidiary to their probe of Kerner's involvement in the allocation of racing dates.

██ A duplicitous count is one which charges more than one distinct and separate offense. United States v. Crummer, 10 Cir., 151 F.2d 958, 963, cert. denied 327 U.S. 785, 66 S.Ct. 704, 90 L.Ed. 1012. A count does not become duplicitous because more than one means may be alleged to have been involved in the commission of the single offense. Id. See also Driscoll v. United States, 1

---

Q. Did you discuss with Mr. Bradley the taking of dates away from Maywood and giving them to another entity?

A. I have never had any kind of discussion of that sort with anybody. I tell you now, I told you before, and I tell you again, I never injected myself in the selection of dates at any time.

Q. Well, specifically, did you tell Mr. Bradley that the Harness Racing Commission should take dates away from Maywood and give those dates to Sportsman's Park and to Washington Park?

A. I say again, I never directed anybody to do anything with racing dates, and I can say that unequivocally. I never was involved in it. I never had any discussion of dates. I knew the dates after the Commission had determined them, but I tell you that unequivocally.

Q. How did you learn the dates after the Commission had determined them?

A. They are published. Usually I got them the day before they were published. Mr. Miller and a couple of people would come to me and say, "These are the dates." I would say, "Fine. Publish them."

Q. Would you have to okay them for publication?

A. No, this was a courtesy they were doing for me. In other words, I knew the dates possibly 24 hours before the public did, but I never changed a date, I never suggested a change of date at any time, and I can say that unequivocally.

Q. Do you recall James Hayes who was connected with the Racing Commission?

A. The name is familiar.

Q. Did you ever talk to him about racing dates?

A. No.

Q. Do you remember making—

A. Mr. Woerheide, so that we can save your time and mine, I want you to know unequivocally without any reservation whatsoever I never discussed racing dates with anybody at any time with the exception of the complaint filed by Allen, I think, whom I have mentioned. I tell you I never discussed racing dates with anyone.

Q. Judge Kerner, I want to ask you if you made a long distance call to Mr. Hayes at a time when he was out of the State of Illinois and asked him to change certain harness racing dates?

A. I have no recollection of that, none. I don't know why I should. I never involved myself.

Q. Is it your recollection you did not make a long distance call to him and ask him to change harness racing dates?

A. Wait a minute, now, let's divide that question in two parts. It's possible I made a long distance call. That's possible, but as to dates, no. What the conversation may have been, I don't know, but I can assure you right now, and I want the Grand Jury to understand this, I never interjected myself personally in racing dates with anybody at any time except this one instance of complaint that I had from Allen.

Q. That would include a specific request to Mr. Bradley to change dates?

A. Yes, sir.

Q. And that would include a specific request to Mr. Hayes to change dates?

A. Yes. I can't understand what my purpose would be in even suggesting it.

Cir., 356 F.2d 324, 331, vacated on other grounds, 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034; United States v. Warner, 8 Cir., 428 F.2d 730, 735, cert. denied 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191; Greenbaum v. United States, 9 Cir., 80 F.2d 113, 116. In perjury cases this means that where one offense is committed, all the false declarations pertaining to that offense can be charged in one count without making that count duplicitous. See Vitello v. United States, 9 Cir., 425 F.2d 416, 418, cert. denied 400 U.S. 822, 91 S.Ct. 43, 27 L. Ed.2d 50; United States v. Edmondson, 5 Cir., 410 F.2d 670, 673, n. 6, cert. denied 396 U.S. 966, 90 S.Ct. 444, 24 L. Ed.2d 430.

■ Kerner next contends that the perjury conviction was invalid under Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568, because of the possibility that it was based on his answer to the following question:

Q. Did you ever say to anyone with respect to Egyptian Trotting dates, "It is difficult to make a decision when two people want the same racing dates?"

Kerner's answer was as follows:

A. I could not have made *that* statement. (Emphasis added.)

It is argued that the variance between the words which Lee, president of Egyptian Trotting Association, testified that Kerner had used in a conversation regarding Egyptian dates, and the language which was used in the question posed to Kerner before the grand jury made Kerner's answer, "I could not have made that statement," literally true. The language which Lee testified that Kerner had used was that he (Kerner) was "in the middle of the thing and would probably have to make the decision."

It is clear from Kerner's testimony before the grand jury (see n. 2) that he was not attempting to evade or be unresponsive on the questions relating to any involvement by him in the fixing of racing dates. To the contrary, he was at pains to be explicit and emphatic before the grand jury that he had at no time and in no manner ever injected himself into that area, as a repetition of the two following statements demonstrates:

A. * * *. [S]o that we can save your time and mine, I want you to know unequivocally without any reservation whatsoever I never discussed racing dates with anybody at any time with the exception of the complaint filed by Allen, I think, whom I have mentioned. I tell you I never discussed racing dates with anyone.

\* \* \* \* \* \*

A. * * * [B]ut I can assure you right now, and I want the Grand Jury to understand this, I never interjected myself personally in racing dates with anybody at any time except this one instance of complaint that I had from Allen.

■ As to the contention that § 1623 is unconstitutional in having eliminated the long-prevailing rule that perjury must be proven by two witnesses, such cases as there have been upon the question have all rejected the contention. In Weiler v. United States, 323 U.S. 606, 608–610, 65 S.Ct. 548, 550, 89 L.Ed. 495, the government had urged the Supreme Court to abandon the rule, but the Court refused to do so, saying:

Our system of justice rests on the general assumption that the truth is not to be determined merely by the number of witnesses on each side of a controversy * * *.

The special rule which bars conviction for perjury solely upon the evidence of a single witness is deeply rooted in past centuries * * *.

Whether it logically fits into our testimonial pattern or not, the government has not advanced sufficiently cogent reasons to cause us to reject the rule. * * * 'The rule has long prevailed, and no enactment in derogation of it has come to our attention. The absence of such legislation indicates that it is sound and has been found satisfactory in practice.'

**1156**

The courts that have had occasion to deal with § 1623 have regarded Weiler as implying that the two-witness rule is not one of due process substantiveness and as merely holding that it ought not be abolished in the absence of legislation by Congress. No court has yet upheld the challenge to the constitutionality of § 1623. See United States v. Ruggiero, 2 Cir., 472 F.2d 599; United States v. McGinnis, S.D.Tex., 344 F.Supp. 89; United States v. Ceccerelli, W.D.Pa., 350 F.Supp. 475. Congress has the power to abrogate a long-standing rule of less than constitutional dimensions. See Dutton v. Evans, 400 U.S. 74, 80–83, 91 S.Ct. 210, 27 L.Ed.2d 213; Hawkins v. United States, 358 U.S. 74, 79, 70 S.Ct. 136, 3 L.Ed.2d 125.

We agree with the holding of the Second Circuit in Ruggiero, *supra*, 472 F.2d 599, at 606:

It is alleged that the removal by [§ 1623] of the "two-witness rule" or "corroboration rule" for perjury cases violates the confrontation clause of the Sixth Amendment. While it is true that the "two-witness" rule has long prevailed in the federal courts, it is not one of constitutional dimension. * * * Here Congress has specifically provided that "[I]t shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence." As the rule is not of constitutional dimension, Congress' judgment controls.

We affirm Kerner's conviction on Count XIV.

*VII. Validity of Kerner's Conviction under the False Statement Count.*

Count XV charges Kerner with making false statements to IRS agents in violation of 18 U.S.C. § 1001 which provides that "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up * * * a material fact, or makes any false, fictitious or fraudulent statements or representations" shall be punished by fine or imprisonment.

On July 15, 1970, special agents Stufflebeam and Campbell of the IRS saw Kerner in his chambers, told him that he was under criminal investigation for income tax violations, and gave him the *Miranda* warning. Stufflebeam asked Kerner to identify the "Chicago Co." listed in his 1967 tax return as a stock, the sale of which had produced a long-term capital gain. Kerner said that the reference was to a financial institution, that he had purchased the stock on the advice of his broker, and that a friend of his, Isidore Brown, was a corporate officer. Kerner did not deny making these statements. The evidence established that the stock in Chicago Co. was privately held, that Kerner had never owned any of its stock, and that Isidore Brown had never been involved with that company. Kerner also told the agents that the "Chicago Co." transaction did not refer to Chicago Harness Racing Company and that his only transactions in racing stock involved CTE and BJC. After the conference with the IRS agents, Kerner called on his accountant the next morning and disclosed to him that Chicago Co. was really CHR. The evidence is more than sufficient to establish that the statements were false and were made knowingly and willfully. Kerner contends that oral conversational responses given in an interview with the investigative agents, while not under oath, do not suffice to support a § 1001 charge.

The first problem is whether the statements were made in connection with a matter within the jurisdiction of a federal department or agency. The history of § 1001 has been reviewed at great length in many decisions. See e. g. United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598; United States v. Beacon Brass Co., Inc., 344 U. S. 43, 73 S.Ct. 77, 97 L.Ed. 61; United States v. Bramblett, 348 U.S. 503, 75 S. Ct. 504, 99 L.Ed. 594; and United States v. Adler, 2 Cir., 380 F.2d 917,

cert. denied 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602. For our purposes it suffices to note that § 35 of the Criminal Code, the predecessor of § 1001, originally condemned only false claims intended to defraud the United States of property. It was amended in 1934 "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *Gilliland,* 312 U.S. at 93, 61 S.Ct. at 522. Hence, proof of pecuniary loss is no longer required. Ibid. *Beacon Brass* recognizes that there is no distinction between oral and written statements, 344 U.S. at 46, 73 S.Ct. 77. The 1948 revision, which put § 1001 in its present form, 62 Stat. 683, did not make any substantive change. *Bramblett,* 348 U.S. at 508, 75 S.Ct. 504. The statement need not be under oath. Adler, 380 F.2d at 922, and cases there cited. In Bryson v. United States, 396 U.S. 64, 70, 90 S. Ct. 355, 24 L.Ed.2d 264, the Court said:

> Because there is a valid legislative interest in protecting the integrity of official inquiries * * * we think the term "jurisdiction" should not be given a narrow or technical meaning for purposes of § 1001 * * *. A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001.

Kerner argues that the statute does not apply to statements made to investigating agents. Prime reliance is placed on Friedman v. United States, 8 Cir., 374 F.2d 363, which involved a false statement to an FBI agent in an effort to initiate an investigation. From its review of the history of § 1001, the court concluded that the statute was intended to facilitate the proper functioning of regulatory agencies. The court pointed out that the FBI was empowered to investigate but not regulate and said that false information did not pervert the investigative function, 374 F.2d at 366 and 369. In *Bryson,* 396 U.S. at 71, n. 10, 90 S.Ct. at 360, the Court referred to *Friedman,* and after noting that the FBI "had no power to adjudicate rights, establish binding regulations, compel the action or finally dispose of the problem giving rise to the inquiry" said. "We have no occasion in the present context either to approve or disapprove Friedman's holding." In United States v. Adler, 2 Cir., 380 F.2d 917, 922, the Second Circuit expressly rejected Friedman.

Kerner says that IRS special agents are in the same category as FBI agents because their function is the investigation of criminal violations of the tax laws. Although those agents make criminal investigations, our attention is directed to no statute or regulation which limits them to that area. The IRS differs from the FBI in that it has regulatory responsibilities in the administration and enforcement of our self-assessment income tax system. It promulgates regulations (26 U.S.C. § 7805(a)), appoints personnel "for the administration and enforcement of the internal revenue laws," (§ 7803(a) and §§ 7601 et seq.), and may assess deficiencies, penalties, and interest (§§ 6201 et seq., 6211 et seq., 6601, 6651, 6671, and 6672). These statutes provide a basis for the request by the agents that Kerner furnish them with information regarding his tax return. The jurisdictional requirement of § 1001 is satisfied. See United States v. Ratner, 9 Cir., 464 F.2d 101, 103; United States v. McCue, 2 Cir., 301 F.2d 452, 454–456, cert. denied 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808; and Knowles v. United States, 10 Cir., 224 F.2d 168, 171–172. We recognize the concern which has been expressed with regard to the possible over-extension of § 1001, see National Commission on Reform of Federal Criminal Laws, Working Papers, pp. 671–673, but we are convinced that any judicial interpretation excluding statements to IRS agents from the application of § 1001 would be to give the term "jurisdiction" as used therein the "narrow or technical meaning" which *Bryson* forbids. 396 U.S. at 70, 90 S.Ct. 355. Any change in the law must come from Congress.

The remaining problem is whether Kerner willfully and knowingly made a false statement of a material fact. Paternostro v. United States, 5 Cir., 311 F.2d 298, has no application here. The basis of the § 1001 charge there was a series of "exculpatory no" answers to questions of an IRS agent. Kerner, a lawyer of long experience in public office, did more than deny that "Chicago Co." was CHR. He went on and volunteered the information that "Chicago Co." was a financial institution whose stock had been recommended by a broker and whose officers included a friend of his. These statements were false. He also said untruthfully that his only transactions with race track stocks involved CTE and BJC. Many of the unusual and concealed transactions that went to proof of bribery related to CHR stock. Kerner's statements were positive and affirmative, and were calculated to pervert the authorized functions of government. See *Gilliland*, 312 U.S. at 93, 61 S.Ct. 518. They were material to a determination of whether the CHR transactions produced income from a bribe rather than from a legitimate business transaction. If the proceeds were taxable as ordinary income rather than as a long-term capital gain, the IRS had the statutory responsibility and duty to make deficiency assessments and to determine whether any penalties should be imposed. We are convinced that the evidence establishes material false statements made affirmatively, voluntarily, willfully, and knowingly in a matter over which an agency of the United States had jurisdiction. The government proved all the elements essential to conviction under § 1001.

### VIII. *Questions relating to Joinder.*

Kerner contends that the joinder of the perjury count, charging him separately, with the joint counts charging conspiracy, Travel Act, and Mail Fraud violations, was improper, Isaacs complains of the joinder of the counts charging Kerner separately with perjury, violation of § 1001, and false income tax return; he also challenges the joinder of Count XIX charging him separately with a false income tax return.

We have two problems, (1) the joinder of multiple counts against one defendant, and (2) the joinder of multiple defendants. Rule 8(a), F.R.Crim.P., permits the joinder of offenses "if the offenses charged * * * are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Rule 8(b) permits the joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

When multiple defendants are charged in the same as well as multiple counts, a challenge by a single defendant to joinder of offenses in which he is charged is governed by Rule 8(a). Conversely, when one or more defendants challenge joinder and do not restrict their attack to those offenses which pertain solely to them, Rule 8(b) applies. United States v. Sweig, 2 Cir., 441 F.2d 114, 118–119, cert. denied 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711; and United States v. Roselli, 9 Cir., 432 F.2d 879, 898, cert. denied 401 U.S. 924, 91 S.Ct. 883, 27 L. Ed.2d 828.

Rule 8 is construed broadly to allow liberal joinder and thereby enhance the efficiency of the judicial system. United States v. Friedman, 9 Cir., 445 F.2d 1076, 1082, cert. denied 404 U. S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275, and United States v. Roselli, supra, 432 F.2d 899. The word "transaction" contemplates a series of many acts "depending not on so much upon the immediateness of their connection as upon their logical relationship." Moore v. New York Cotton Exchange, 270 U.S. 593, 610, 46 S. Ct. 367, 371, 70 L.Ed. 750; relied on in both United States v. Friedman, supra, and Cataneo v. United States, 4 Cir., 167 F.2d 820, 822–823, in construing Rule 8.

The contention of Kerner, presents a Rule 8(a) problem as does also that of Isaacs with regard to Count XIX. The perjury and other offenses with which we are concerned have a logical relationship. They are all connected with, or arose out of, a common plan to corruptly influence the regulation of horse racing. The perjury charge against Kerner related to his involvement with the racing industry, and evidence of that involvement was pertinent to the proof of the other offenses. Sweig, *supra,* was a case in which perjury counts were joined with a conspiracy count. There, as here, the commonalty of proof sufficed to establish that the offenses were "connected together" for the purposes of Rule 8(a). 441 F.2d at 118–119. We find no Rule 8(a) violation in connection with any of the challenged counts.

This brings us to the argument of Isaacs which presents a Rule 8(b) problem arising out of the joinder of the perjury, § 1001, and false return counts charging Kerner separately. Multiple defendants may be joined if they have participated in the same series of acts or transactions. The conspiracy, Travel Act, and Mail Fraud counts all bore on the underlying claim of bribery. The evidence to establish the counts in question was pertinent to proof of other counts. The reliance of Isaacs on Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790; and Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931, is misplaced. Those cases were not concerned with joinder but rather with the admissibility of evidence.

Joinder of separate income tax offenses against individual coconspirators was upheld in United States v. Roselli, supra, 432 F.2d at 899. There, as here, the underlying crime generated the income tax violations. United States v. Granello, 2 Cir., 365 F.2d 990, cert. denied 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458, is not in point because in that case the venture producing the unreported income did not involve common acts of a criminal nature. In sum, the pertinent offenses which Isaacs says were improperly joined were all parts of the same series of acts or transactions, and hence subject to joinder under Rule 8(b).

IX. *Questions Relating to Severance.*

(a) *Joinder of count charging Kerner with false declarations before the grand jury.*

Defendants argue that even if joinder is permissible under Rule 8, a severance should have been granted under Rule 14, F.R.Crim.P. An appropriate joint motion was made before trial and denied. See United States v. Isaacs, N.D.Ill., 347 F.Supp. 743, 761. Rule 14 provides that if a defendant is prejudiced by a joinder of offenses or defendants, "the court may * * * grant a severance of defendants or provide whatever other relief justice requires." A denial of Rule 14 relief is reviewable only for abuse of discretion or plain error affecting substantial rights. United States v. Echeles, 7 Cir., 352 F.2d 892, 896–897; and United States v. Sweig, 2 Cir., 441 F.2d at 119.

Consideration must be given to United States v. Pacente, 7 Cir., 490 F.2d 661, decided December 28, 1973. There a police officer was charged in a two-count indictment with perjury before a grand jury in violation of § 1623 and interference with commerce by threats or violence in violation of 18 U.S.C. § 1951. Departmental regulations made it compulsory for a police officer to testify before a grand jury or suffer suspension or discharge. The court found prejudice because of (1) impeachment of defendant resulting from knowledge by the petit jury that the grand jury determined that defendant had lied, (2) the burden of proof was shifted to defendant who must take the stand to deny the false declaration charge, and (3) the spill-over of evidence from the false declaration count to the substantive count. We have a different situation. Kerner voluntarily appeared before the grand jury. Instead of a two-count indictment charging perjury and the sub-

stantive offense, we have a 19-count indictment charging, among other things, conspiracy, false statements to IRS agents, and false tax returns. We agree with United States v. Sweig, 441 F.2d at 118–119, that prejudice did not result from the trial of a defendant on both conspiracy and perjury counts. If our conclusions are at odds with United States v. Pacente, supra, we can only say that we disagree with that decision. The false statement and false tax return counts charge offenses involving deceitful conduct. The desire of Kerner to testify in support of his honesty was no more urgent in defense of the perjury count than it was in connection with these other counts. There was no shifting of the burden of proof. The jury was adequately instructed in this regard.

Rule 14 must be read along with Rule 8 which balances the possibility of prejudice against considerations of economy and efficiency in the use of the judicial process. We have before us a complex conspiracy involving many acts by the defendants and others. In *Pacente* the false declaration count was one-half of the case against him. Here the presence of multiple counts involving numerous offenses minimizes any possible spillover effect of the testimony relating to false declarations and relegates those declarations to a peripheral role. Kerner initiated the false declaration charge by testifying before the grand jury. He may not take advantage of a situation which he created. The court did not abuse its discretion in denying a severance to Kerner because of the joinder of the perjury count.

 So far as Isaacs is concerned, the court instructed the jury that evidence of Kerner's perjury should not be permitted to prejudice Isaacs. In these circumstances there was no abuse of discretion. United States v. Gill, 7 Cir., 490 F.2d 233, decided December 28, 1973; and United States v. Kahn, 7 Cir., 381 F.2d 824, 837–838, cert. denied 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661.

(b) *Failure of Isaacs to testify*

 After almost five weeks of trial and after the close of the government's case, Kerner's counsel allegedly became aware for the first time that Isaacs would not take the stand. Counsel then made an oral statement purporting to show that Isaacs' testimony would exculpate Kerner and moved for a severance. The court denied the motion. In this situation, the moving party must show that he will be unable to obtain a fair trial without severance, not merely that a separate trial will offer a better chance of acquittal. United States v. Blue, 7 Cir., 440 F.2d 300, 302, cert. denied 404 U.S. 836, 92 S.Ct. 123, 30 L. Ed.2d 68. Kerner's reliance on United States v. Echeles, 7 Cir., 352 F.2d 892, is misplaced. In that case the codefendant had three times in open court exculpated the defendant. The court held only, Ibid. at 898, that the importance of the codefendant's record exculpatory testimony required a severance. The court comments, Ibid. at 899, that a separate trial would not be time-consuming, but entirely practicable.

In United States v. Johnson, 7 Cir., 426 F.2d 1112, 1116, cert. denied 400 U. S. 842, 91 S.Ct. 86, 27 L.Ed.2d 78, the denial of a severance was upheld against the claim that testimony of codefendants would be unavailable unless a separate trial was granted. The court cited with approval, Ibid. at 1116, the statement in United States v. Kahn, 7 Cir., 381 F.2d 824, 841, that "[t]he unsupported possibility that such testimony might be forthcoming does not make the denial of a motion for severance erroneous." In the case at bar, the trial judge, in denying the severance, relied on *Johnson* and said that to grant severance in the circumstances presented would destroy the use of joint trials.

 Duplication of an unusually complex trial, such as the one before us which lasted from January 3, 1973, to February 19, 1973, is a factor which a trial court may properly consider when ruling on a severance motion. United

States v. Shuford, 4 Cir., 454 F.2d 772, 777, n. 5. Additionally, there was no representation that Isaacs' testimony would be forthcoming in a separate trial. "The court is not required to sever where the possibility of the codefendant's testifying is merely colorable or there is no showing that it is anything more than a gleam of possibility in the defendant's eye." Byrd v. Wainwright, 5 Cir., 428 F.2d 1017, 1022.

 To support his severance claim, Kerner mounts a constitutional challenge based on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, which on confrontation rationale held inadmissible the inculpatory statement of a codefendant. The Court said, however, 391 U.S. at 128, n. 3, 88 S.Ct. at 1624:

> There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.

Kerner points out that under the coconspirator exception to the hearsay rule, Mrs. Everett and Miller were permitted to testify to various statements of Isaacs relating to the transactions in issue and implying Kerner's connection therewith. The argument is that because of the inability to call Isaacs as a witness, Kerner was denied the right to refute this testimony.

In Dutton v. Evans, 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213, the Court said that it could not be argued "that the constitutional right to confrontation requires that no hearsay evidence can ever be introduced." In United States v. Jones, 7 Cir., 438 F.2d 461, 466, the Seventh Circuit rejected the applicability of *Bruton* to a situation where the statements of a codefendant "fall within the well recognized exception to the hearsay rule that declarations made in connection with a joint venture are admissible against the party who is not present." The community of interest of the conspirators evidences likelihood of reliability. See concurring opinion of Mr. Justice Harlan in *Dutton*, 400 U.S. at 99, 91 S.Ct. 210. Kerner's rights under the Confrontation Clause were not violated. United States v. Cerone, 7 Cir., 452 F.2d 274, 283, cert. denied 405 U.S. 964, 92 S.Ct. 1168, 31 L. Ed.2d 1169.

## X. *Miscellaneous, including Questions regarding Admission of Evidence.*

### (a) Income tax counts.

 Kerner concedes that Count XVI, charging evasion of tax due for 1966 in violation of 26 U.S.C. § 7201, stands or falls on the sufficiency of proof of bribery. We have held the proof sufficient. The taxable event occurred when Kerner obtained CTE and CHR shares for a fraction of their actual worth. Count XVIII charging Isaacs with tax evasion presents the same situation.

 Count XVII against Kerner and Count XIX against Isaacs each charge false statements in tax returns for 1967. These statements included misidentification of CTE, CHR, and BJC, and the claim of long-term capital gains based on a 1962 acquisition date. The record sustains the government claim that the statements were false and were made willfully.

### (b) Examination of Miller on intent of Mrs. Everett in making stock offer.

Defense counsel objected to the following question put to Miller:

> Q. Mr. Miller, why did you relay Mrs. Everett's offer of stock to Governor Kerner and Mr. Isaacs?

 This called for Miller's intent, not the intent of Mrs. Everett. The answer included three considerations: (1) "She was in need of the favor of both Governor Kerner and Mr. Isaacs"; (2) "She was eager to ingratiate herself on a continuing basis with [them]"; and (3) "She certainly wanted to avoid any

adverse influence in connection with the racing dates * * *." These statements were cumulative of Mrs. Everett's testimony and had a solid foundation In our opinion the objection was properly overruled.

#### (c) Examination of members of Illinois Racing Board.

■ Several members of the Illinois Racing Board were asked on direct examination by the prosecutor whether they would have granted racing dates to CTE for 1967 and BJC for 1968 if they had known of Kerner's concealed interest in those companies. A typical answer was that of board member Crosby who said that he would not have voted to grant the dates. Later a similar question was asked board member Mc-Kellar on direct examination during the defense case, and his answer was that such knowledge would not have influenced his action. This subsequent use of similar evidence minimizes, if not cures, whatever error there might have been in the admission of this bit of prosecution testimony. See 1 Wigmore on Evidence, § 18, p. 345. In any event we believe that in a case such as that at bar the "what if" questions were proper. Bettman v. United States, 6 Cir., 224 F. 819, 830, cert. denied 239 U.S. 642, 36 S.Ct. 163, 60 L.Ed. 482; United States v. Aleli, 3 Cir., 170 F.2d 18, 20; and Searfoss v. Lehigh Valley R. Co., 2 Cir., 76 F.2d 762, 763–764.

#### (d) The Modie Spiegel letter.

■ Modie Spiegel, who for a time was president of CHR, testified for the prosecution. On direct examination he was shown a letter dated October 3, 1963, written by him to Mrs. Everett, and intended for presentation to CHR board members. The letter was received for the limited purpose of showing the communication between Spiegel and Mrs. Everett, and was received for that purpose with a cautionary instruction. The letter contained the statement:

I was informed that it was imperative to have others receive stock in order to get CHR its dates.

■ Spiegel identified Mrs. Everett as the source of the information. Thus, the statement became admissible under the coconspirator's exception and there was no impropriety in the prosecutor's reference thereto during closing argument.

#### (e) Kerner's contribution to the State Historical Society.

■ On cross-examination Kerner was asked about a tax deduction which he had claimed because of a contribution to the State Historical Society, a matter not in issue. After objection, the court instructed the jury that the deduction was lawful and that no prejudice should be felt against Kerner because of it. The admissibility of evidence and the extent and scope of cross-examination are matters within the discretion of the trial judge whose rulings will not be disturbed in the absence of abuse of discretion. Smith v. Illinois, 390 U.S. 129, 132, 88 S.Ct. 748, 19 L. Ed.2d 956; and United States v. Pate, 7 Cir., 426 F.2d 1083, 1086, cert. denied 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445. The cautionary instruction of the court rendered the cross-examination harmless. See Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L. Ed.2d 476, and United States v. Kahn, 7 Cir., 381 F.2d 824, 838, cert. denied 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661.

#### (f) Unfair cross-examination of defense witnesses.

■ Isaacs argues that the government improperly cross-examined certain witnesses called by Kerner so as to create the illusion that Isaacs had done things to earn the bribe. Negative responses to such questions were emphasized by Isaacs' counsel in closing argument. In the circumstances it is difficult to understand how Isaacs was prejudiced. See McBride v. United States,

10 Cir., 409 F.2d 1046, 1048. Other contentions go to innuendoes later proven, and to questions which were essentially innocuous. When the few instances complained of by Isaacs are viewed against the background of the six-week trial and 7,600 page trial transcript, no prejudicial error appears.

### XI. *The Charge to the Jury.*

■ The instructions of the court cover 140 pages of the record and disclose the diligence, patience, and thoroughness of the trial judge. The shotgun attack of the defendants on the instructions is more confusing than convincing. It is elementary that the instructions must be considered as a whole and it is sufficient if they treat the issues fairly and adequately. Few of the points raised merit discussion.

■■ Isaacs asserts that he was entitled to the text of the court's instructions before closing argument. The court had informed counsel of its action in regard to each requested instruction. This is enough to comply with Rule 30, F.R.Crim.P. See United States v. Shirley, 7 Cir., 435 F.2d 1076, 1078; Martin v. United States, 10 Cir., 404 F.2d 640, 643, and like cases. United States v. Bass, 7 Cir., 425 F.2d 161, is not to the contrary. In that case counsel was misled and could not effectively argue his case. Absent prejudice caused by surprise, a court is not obligated to furnish copies of its instructions before argument. See Wright, Federal Practice and Procedure, § 482, p. 277. In the case at bar there is no convincing showing of either prejudice or surprise, except for the previously mentioned instruction on the substantive Travel Act counts.

The objections of the defendants to the instructions on elements of bribery, specific intent, and good faith do not impress us. When the instructions are taken as a whole, these points are adequately and fairly covered.

The defendants attack the following portion of the instruction on credibility of witnesses:

If there are conflicts in the statements of different witnesses, it is your duty to reconcile it if you can, for the law presumes that every witness is sworn to [tell the] truth, but if you cannot reconcile them, the law makes you the sole and exclusive judges of the credibility of the witnesses, and the weight to be given their testimony.

The government points out that no objection to this instruction was raised at the trial and, hence, error has been waived. See United States v. Milstein, 7 Cir., 401 F.2d 51, 53–54. However, some courts have applied the plain error rule, Rule 52(b), F.R.Crim.P., to similar instructions. See e. g. United States v. Birmingham, 10 Cir., 447 F.2d 1313, 1315–1316. We consider the issue because of its importance.

In Cupp v. Naughten, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368, the Court had before it a state habeas corpus case in which the instructions said, "Every witness is presumed to speak the truth." In *Cupp* the Court found that the instructions on reasonable doubt, burden of proof, and presumption of innocence were adequate, and held that in such circumstances the mentioned language did not shift or negate established constitutional guarantees. Our case differs from *Cupp* because here the statement was that every witness "is sworn to [tell the] truth," not presumed to tell the truth as in *Cupp*. Also, in the instant case an affirmative defense was presented by the defense through many witnesses. Accordingly, whatever benefit the instruction afforded went to both the prosecution and defense.

■ ■ The challenged instruction must " * * * not be judged in artificial isolation, but must be viewed in the context of the overall charge." 414 U.S. at 154, 94 S.Ct. at 404. In our opinion the attacked instruction does not constitute a denial of due process, a conflict with the defendants' presumption of innocence, a shift of the burden of proof, or an invasion of the jury's province to

determine the credibility of witnesses. It did not invade any constitutional right.

■ Isaacs complains that the "accomplice witness" instruction was faulty in that it presented conflicting standards. We do not so read the instruction. It first defines accomplice accurately and then says:

> The testimony of an accomplice is admissible and entitled to such weight as the jury feels it should have.

> In weighing the evidence of an accomplice, you should give due regard to the fact that he might have been on trial as a defendant himself. You should weigh his testimony carefully and cautiously.

This is not a case like United States v. Donnelly, 7 Cir., 179 F.2d 227, 232–233, where the court inconsistently told the jury, first, that accomplice testimony is to be judged by the same rules as apply to other testimony and, second, that accomplice testimony must be regarded with due care. In the case at bar, the court defined the duty of the jury and then stated the test which it was to apply. United States v. Balodimas, 7 Cir., 177 F.2d 485, 487, is likewise not applicable. There the court said that the government witnesses were accomplices who had admittedly broken the law. That instruction presupposed the commission of a crime. The instruction before us has no like infirmity. The Seventh Circuit has uniformly upheld "accomplice witness" instructions when, as here, they point out, what an accomplice is and the test to be applied to his testimony. United States v. Battaglia, 7 Cir., 394 F.2d 304, 313–314, cert. denied 401 U.S. 92, 91 S.Ct. 868, 27 L.Ed.2d 828; see also United States v. Pritchard, 7 Cir., 458 F.2d 1036, 1040, cert. denied 407 U.S. 911, 92 S.Ct. 2434, 32 L.Ed.2d 685; and United States v. Fellabaum, 7 Cir., 408 F.2d 220, 227, cert. denied 396 U.S. 818, 90 S.Ct. 55, 24 L.Ed.2d 69.

The prolix instructions requested by defendants merit no mention. It suffices to say that they suffer from imprecision and over-statement and that insofar as they were appropriate the trial court incorporated them into its charge.

Except as noted above in our discussion of the Travel Act counts, we find no error in the charge of the court.

## XII. *Summations of Government Counsel.*

■■ The case was vigorously and aggressively argued by both sides. The closing argument of a prosecutor need not be "confined to such detached exposition as would be appropriate in a lecture." United States v. Wexler, 2 Cir., 79 F.2d 526, 530, cert. denied 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991, because "[t]o shear him of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice." Di Carlo v. United States, 2 Cir., 6 F.2d 364, 368, cert. denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168. The controlling standard is found in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, which says that a United States Attorney "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." An advocate is "permitted considerable latitude in replying to his opponent's arguments." United States v. Lawler, 7 Cir., 413 F.2d 622, 628, cert. denied 396 U.S. 1046, 90 S.Ct. 698, 24 L.Ed.2d 691; United States v. Hoffa, 6 Cir., 349 F.2d 20, 51, aff'd 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374; and see Lawn v. United States, 355 U.S. 339, 359–360, n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321. With these principles in mind, we examine the particular attacks made by the defendants.

■ The first point relates to the United States Attorney's defense of his integrity. Counsel for Kerner referred to the "vigorous imagination of an ambitious prosecutor," and Isaacs' lawyer said that there was an overwhelming desire to get Otto Kerner and asked the

rhetorical question whether the only way to do it was to trample over Isaacs. Kerner's counsel compared the prosecution's technique to that of Adolph Hitler. References were made to the desperation of the prosecution and efforts of the prosecution to persuade witnesses to change their testimony. The comments of the prosecutor in reply fall well within the invited response doctrine.

After referring to the immunity agreement given to Miller by the prosecution, the United States Attorney said:

> Those were the terms. In return for his truthful testimony, the charges against William Miller in this case would be dismissed.

█ Isaacs contends that this amounts to an improper statement by the prosecutor of his opinion that Miller was a truthful witness. The statement does not vouch for Miller's credibility. There is no insinuation that the comment of the prosecutor was based on anything de hors the record. See Lawn v. United States, 355 U.S. 339, 359–360, n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321. The argument of Isaacs that the prosecutor's reference to the immunity agreement improperly insinuated that the government possessed evidence outside of the record is fanciful. The agreement was before the jury for such consideration as anyone might wish to give it.

█ Arguments of defense counsel insinuated that the United States Attorney, as an individual, had the power to indict, and had misused that power. In reply the prosecutor said:

> A Grand Jury of 23 citizens in this District determined that there was sufficient evidence to bring this case to trial. I have no power to indict. I just put my name on it. Without a vote of the Grand Jury, this case can't be here. That much is obvious.

The statement of the prosecutor was an invited response and if anything was wrong with it the instructions of the court on the function of an indictment were both elaborate and adequate.

In closing argument Isaacs' counsel made the following explanation of Isaacs' failure to endorse the check representing the sale of the BJC stock:

> Why didn't Isaacs want to present it? I think the answer is simple. It wasn't all his money. It was only half his money. Why endorse the check when it is not all going to go to him?

In reply, the prosecutor said:

> Mr. Wolfson tells you this morning that the reason why Isaacs didn't want to endorse that check was because all the money wasn't his. We have waited now six weeks for the explanation of why Isaacs didn't want to endorse that check. Finally, Mr. Wolfson gives it to us, and that's the reason.

█ The attempt of his counsel to explain Isaacs' mental processes invited the government to respond to the weakness of the argument. It was not an invitation to the jury to hold Isaacs' failure to testify against him.

█ Perlmutter, an accountant for Isaacs, testified as a government witness and said that the false designation of CHR as Chicago Co., in Isaacs' 1967 return, was an inadvertent typing error. This testimony was at odds with that of Kerner's accountant who said that the designation of Chicago Co. for CHR was in accordance with information furnished by Kerner. Defense counsel argued that the government should have called as a witness Perlmutter's partner, Joseph Golman. The prosecution responded thus:

> After hearing that from one of his accountants, do you think we would put another of his accountants on the stand? Well, if they want testimony like that, they will have to call them. We are not going to call them.

Counsel for Isaacs had stressed Perlmutter's testimony as a defense to the false tax return count. In spite of their reliance on Perlmutter's testimony, counsel would deny the right of the government to comment thereon. If the

"voucher rule" has any remaining vitality, see Chambers v. Mississippi, 410 U.S. 284, 296, 93 S.Ct. 1038, 35 L.Ed.2d 297, and proposed Federal Rules of Evidence, Rule 607, this is no place for its application. Defense counsel baited government counsel into the reply.

 The prosecution introduced certain declarations made by Isaacs to investigators and the grand jury as false exculpatory statements. Under the completeness doctrine, Isaacs' counsel was permitted to offer the statements in their virtual entirety. In closing argument the prosecutor referred to those statements as lies. The argument complained of can only be viewed as a comment on the falsity of Isaacs' pretrial statements. Those statements were in evidence and subject to comment just as any other bit of evidence. See United States v. Chaney, 3 Cir., 446 F.2d 571, 575–576, cert. denied 404 U.S. 993, 92 S.Ct. 543, 30 L.Ed.2d 546.

 Kerner argues that the closing arguments of government counsel unduly and prejudicially emphasized the perjury count. A prosecutor may comment on the credibility of a defendant who takes the witness stand. United States v. Jansen, 7 Cir., 475 F.2d 312, 317, cert. denied 414 U.S. 826, 94 S.Ct. 130, 38 L.Ed.2d 59 (Oct. 9, 1973); see also United States v. Deloney, 7 Cir., 389 F.2d 324, 326, cert. denied 391 U.S. 904, 88 S.Ct. 1652, 20 L.Ed.2d 417. We have upheld the perjury count and the sufficiency of the evidence to sustain a conviction of that charge. Thus, we do not have a situation of government counsel stressing an invalid count in his argument. The arguments of defense counsel invited the responses made by the prosecutors.

In our opinion the arguments of the prosecutors, taken as a whole or in piecemeal, were well within permissible standards.

We are not mindful of other contentions made by the defendants. We have not discussed them because either they have been sufficiently covered by what we have already said or they are so clearly without substance as to make a review of them unnecessary.

In summary, we affirm the convictions of Isaacs and Kerner on Counts I, VI, VIII, IX and XIII, the conviction of Kerner on Counts XIV, XV, XVI and XVII, and the conviction of Isaacs on Counts XVIII and XIX. We reverse the convictions of Isaacs and Kerner on Counts II, III and IV.

This per curiam opinion represents the views of the members of the panel, except as specially noted in Judge Johnsen's separate concurring and dissenting opinion.

JOHNSEN, Senior Circuit Judge (concurring in part, dissenting in part).

I am in agreement with most of the holdings and statements of the per curiam but differ with a few of them.

I agree that the district court was possessed of subject-matter jurisdiction of the charges against Kerner, but to me this power was derived from Article III, Section 1, of the Constitution and from 18 U.S.C. § 3231 of the Criminal Code.

Under the constitutional provision, the judicial power of the United States has been vested "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." In creating the district courts, Congress manifestly had the right under the constitutional provision to confer such nature and extent of subject-matter jurisdiction upon them as it chose. Under 18 U.S.C. § 3231, it chose to give the district courts "original jurisdiction * * * of all offenses against the laws of the United States."

If the ambiguous provision of Article I, Section 3, Clause 7 of the Constitution was intended to mean that any officer of the United States, who was subject to having impeachment proceedings brought against him, could not be made

to stand trial on criminal charges until after he had been convicted in impeachment proceedings, this in my opinion would at most provide a personal privilege or immunity to him which he was at liberty to assert or not to assert, as he chose. Kerner must be held to have chosen not to attempt to assert any such privilege or immunity, for he never raised the question in any form before the trial court—neither by attempt to have the indictment dismissed, nor by motion to have the trial proceeding stayed.

This is as far, in my opinion, as it is in any event necessary to go to sustain the district court's jurisdiction to try Kerner. Whatever determination may ultimately be necessary to be made of the impeachment and criminal offense question, it does not seem to me that it is necessary or wise to undertake to make that determination in the present situation. The question has been the subject of bitter agitation and heated dispute on both sides, and the majority's holding can open the door to consequences which it may be better for the nation not to have to experience in the turbulence of the present times. I would hold that, on Kerner's submission of himself to trial, there is no need to decide the specific question.

I am unable to agree with the majority's affirmance of Kerner's conviction of mail fraud under Counts VIII and IX, as to which the mailings occurred after August, 1966. Kerner had by that time become the full beneficial owner of the race track stock involved in the bribery. Mrs. Everett no longer had any right of control over it. Kerner had the right to continue to hold the stock, whose value had been increasing, or to sell it. He chose to sell it, for reasons which are not difficult to infer. What Mrs. Everett had done in bribery was to obligate herself to sell and later to make actual sale of the race track stock to Kerner at a price greatly below its market value, in expected favorable treatment of her racing interests. When the sale was completed, the stock became the subject of ownership in Kerner, and the bribery offense had reached fruition. The incidents after the use of the mails which occurred in relation to Kerner's disposition of the stock or his obtaining the money therefor, did not go to the completion of the bribery, as between Mrs. Everett and Kerner. United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L. Ed.2d 603, decided by the Supreme Court on January 8, 1974, seems to me to require reversal as to these two counts.

As to United States v. Pacente, 7 Cir., 490 F.2d 661, decided December 28, 1973, discussed in Section IX of the per curiam, that decision, if followed, would, in my judgment, require reversal of all of Kerner's convictions, for failure of the trial court to grant severance. The panel is in agreement that the holding in the case is bad law and that we cannot conscientiously follow it.

## PETITION FOR REHEARING

### ORDER

1. The petition for rehearing of defendant-appellant Theodore J. Isaacs is denied.

2. The petition for rehearing of defendant-appellant Otto Kerner, Jr., is denied.

JOHNSEN, Senior Circuit Judge, dissents.

### PER CURIAM.

Judge Lumbard and Judge Breitenstein are of the view that there is no good reason to delay action on the motions for rehearing, and that there is every reason why the questions raised in this case should be settled without further delay.

■ On three occasions the active circuit judges of the Seventh Circuit, other than Otto Kerner, have recused themselves from any participation in this case. It seems to us that this has left to the court specially designated the task of deciding any issues raised on

appeal; this includes the proper and appropriate application of any rule of law.

Initially, after the filing of a petition for writ of mandamus by the petitioner Kerner on August 4, 1972, all the then active judges of the Seventh Circuit, other than Kerner, recused themselves. This action was communicated to the Chief Justice by Chief Judge Swygert in a letter dated August 9, 1972. Thereafter the Chief Justice, by telegram dated September 19, designated the three judges of this panel to hear and determine all matters arising from the prosecution of the indictment against the defendants.

The trial of Isaacs and Kerner commenced on January 3, 1973. During that trial, two of the active circuit judges of the Seventh Circuit, Chief Judge Swygert and Judge Kiley, testified as character witnesses on behalf of Kerner. After the defendants were convicted on February 19, 1973, and after Kerner filed a notice of appeal on April 26, 1973, all the active circuit judges again recused themselves. Chief Judge Swygert notified the Chief Justice by letter dated April 26, 1973 that it was "the view of the active circuit judges of this court that they should not act upon these appeals." Accordingly, Chief Judge Swygert requested the designation of three judges from outside the Seventh Circuit. As the Chief Justice had already designated the members of this panel, we continued to act pursuant to the designation of September 19, 1972.

We heard argument of the appeals on October 23 and 24, 1973 and reserved decision. In their briefs filed September 4, 1973, and on oral argument, Isaacs and Kerner urged that it was improper to try the perjury charge against Kerner with the other counts of the indictment, and that it was error to deny severance of the perjury count.

While the panel was considering this appeal, argument was heard on December 5, 1973, in United States v. Pacente, before a panel consisting of Chief Judge Swygert, Circuit Judge Sprecher and District Judge Poos. On December 28, 1973, that panel filed its opinion, written by Chief Judge Swygert, which reversed Pacente's conviction. That opinion purported to establish the principle that a defendant could not be tried on substantive counts and a count charging perjury relating to the substantive charges, at the same trial. Counsel for the appellants immediately called our attention to the *Pacente* opinion and we gave it such attention as we thought it deserved in our opinion filed February 19, 1974 which affirmed the convictions on all but three counts.

Judge Johnsen wrote, regarding the *Pacente* case, in his separate concurring and dissenting opinion: "The panel is in agreement that the holding in the case is bad law and that we cannot conscientiously follow it."

Meanwhile, the United States had filed a petition for rehearing and rehearing *en banc* in United States v. Pacente, and on February 19, 1974 the active circuit judges of the Seventh Circuit granted rehearing *en banc*.

Thereafter on March 5, 1974, the appellants filed their petitions for rehearing and rehearing *en banc*. On the same day the clerk entered an order made by six active circuit judges of the Seventh Circuit, listed as Chief Judge Swygert and Circuit Judges Fairchild, Cummings, Pell, Stevens, and Sprecher, reading:

Both defendants-appellants in these appeals have filed a suggestion for a rehearing *en banc*. Each of the judges in regular active service has disqualified himself from consideration of the suggestions for rehearing *en banc*.

Thus, for a third time, the active circuit judges of the Seventh Circuit, excepting Kerner, have disqualified themselves.

■■■■ Isaacs and Kerner have now requested that we delay our disposition of their petitions until after the *en banc* rehearing of *Pacente* which is scheduled for April 10, 1974. We see no need to do so. This panel is under no obligation

to follow any opinions of the Seventh Circuit, whether by a panel or by the court en banc, filed in any cases or matters subsequent to its constitution by the Chief Justice on September 19, 1972. Consequently, having already given lengthy and thorough consideration to all the points raised on the appeal, and on the petitions for rehearing, the petitions for rehearing are denied.

In the event either appellant wishes to file a petition for certiorari within the time allowed, the issuance of the mandate will be stayed subject to the provisions of Rule 41(b) of the Federal Rules of Appellate Procedure.

The petitions for rehearing are severally denied.

JOHNSEN, Senior Circuit Judge (dissenting).

I had hoped that ruling on the petitions for rehearing would have been deferred until after the Court of Appeals for the Seventh Circuit had rendered its decision in the in banc hearing which it has granted of the case of United States v. Pacente, No. 72–1988. Argument in the in banc hearing has been set for April 10, 1974.

In the Pacente case, a panel of the Court (two circuit judges and a district judge) had held, in a decision rendered on December 28, 1973, that failure of the trial court to grant severance as to an indictment count for perjury, committed before the grand jury by which the indictment was returned, and a count for another substantive offense, was so inherently prejudicial, even though a limiting instruction had been given, as to require reversal of both of the convictions which had occurred. That holding, if it had been followed by us in the Kerner case, would have required a reversal of his convictions.

We regarded the Pacente decision as being so unsound that we had the right to disagree with it and could properly refuse to follow it, since it represented the holding of only a single panel. Such differences in holdings between co-equal panels of Courts of Appeals have at times occurred, sometimes inadvertently, and sometimes as a matter of conscientious and firm disagreement.

Usually such a situation is capable of being dealt with by the court taking over the subsequent case for in banc hearing and so establishing the law of the circuit as between the conflicting views of the two panels. No such in banc taking-over of the Kerner case is, however, possible, because of the disqualification which the regular judges of the Court of Appeals have made of themselves as to the case. But the hearing in banc which the Court has granted in the Pacente case will equally be able to establish the law generally of the circuit on the question, and hence necessarily of the Kerner case.

Sitting as a panel of the Court of Appeals for the Seventh Circuit, though from outside the circuit, I do not believe that we could, in judicial responsibility and propriety, refuse to give application in the Kerner case to an in banc holding of the Court, even though we might disagree with it, which would be the situation if the result in the Pacente case should be an in banc adoption of the views of the panel by which the original decision was rendered. In these circumstances, I think we could indicate our disagreement, but we would have to make reversal of the Kerner case and leave to the Supreme Court the question of settling the law which should be applied as a matter of criminal jurisprudence.

It is for these reasons that I feel we ought to defer ruling on the petitions for rehearing. Taking action now could complicate the whole situation, and a refusal to wait might perhaps also put the judicial process into an unfavorable light. Moreover, if the in banc decision in Pacente should be contrary to the holding of the original panel, the problem of our own panel would be solved.